927 F.2d 713
 1991 A.M.C. 1573, 59 USLW 2584, 14
UCC Rep.Serv.2d 620
 A/S DAMPSKIBSSELSKABET TORM, Plaintiff-Appellee, Cross-Appellant,
v.
BEAUMONT OIL LTD. and Banque Paribas (Suisse) S.A., Geneva, Defendants,
Banque Paribas (Suisse) S.A., Geneva, Defendant-Appellant,
Cross-Appellee.
 Nos. 901, 1052, Dockets 90-7832, 90-7834.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 28, 1991.
Decided March 11, 1991.
 
 Mark C. Flavin, New York City (Paul E. O'Brien, James H. Hohenstein, and Haight, Gardner, Poor & Havens, New York City, on brief), for plaintiff-appellee, cross-appellant A/S Dampskibsselskabet Torm.
 Donald F. Luke, New York City (Stephen M. Lazare, Robert Penchina, and Rogers & Wells, New York City, on brief), for defendant-appellant, cross-appellee Banque Paribas (Suisse) S.A.
 John J. Gill, Michael F. Crotty, Joanne Ames, Steven D. Rinaldi, Washington, D.C., filed a brief for amicus curiae American Bankers Ass'n.
 Before TIMBERS, MESKILL and CARDAMONE, Circuit Judges.
 TIMBERS, Circuit Judge:
 
 
 1
 Appellant Banque Paribas (Suisse) S.A., Geneva ("Paribas" or "the bank") appeals from an order and judgment against Paribas entered August 15, 1990 in the Southern District of New York, Vincent L. Broderick, District Judge.
 
 
 2
 Appellee A/S Dampskibsselskabet Torm ("Torm" or "the carrier") commenced this admiralty and maritime action on July 18, 1986, in the District of Oregon, seeking recovery of freight and related charges. In December 1986, the case was transferred to the Southern District of New York. On March 30, 1990, the district court entered a memorandum decision and order granting Torm's motion for summary judgment and denying Paribas' motion for summary judgment. On August 10, the court denied Paribas' motion for an order amending and adding to the court's findings of fact and memorandum, or for a new trial. Final judgment was entered August 15.
 
 
 3
 On appeal, Paribas contends that the court erred in imposing liability upon it because, absent an acceptance of goods or an agreement to pay, liability for shipping charges may not be imposed on a secured creditor who did not act as an owner of the goods. On cross-appeal, Torm contends that the court erred in holding that the bank neither entered into an agreement to pay transportation costs nor accepted delivery of the cargo.
 
 
 4
 For the reasons set forth below, we reverse the district court's imposition of liability on the bank. We find no merit in the carrier's cross-appeal.I.
 
 
 5
 We shall set forth only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.
 
 
 6
 Defendant Beaumont Oil Ltd., a Bermuda corporation, and its affiliate, Beaumont Oil, Inc., a Texas corporation, (collectively, "Beaumont"), routinely used Paribas' financial services. In May 1986, Beaumont sought to purchase approximately 240,000 barrels of unleaded gasoline from Corpoven S.A. ("Corpoven"), the state oil corporation of Venezuela. Pursuant to a May 22, 1986 telex to Paribas, Beaumont sought to obtain financing from the bank, in the form of a letter of credit in favor of Corpoven. In the telex Beaumont granted a "first security interest" in the cargo to Paribas and specified the documents that Corpoven would have to present to the bank in order to obtain the funds. Among the documents required was the "presentation of original bills of lading, 3/3 full set, being originally signed issued to the order of ... Paribas ..., notify Beaumont Oil, Inc., Houston, Texas showing as destination New York harbor." Paribas issued a letter of credit on May 23, 1986, in the amount of approximately $5.2 million, for the account of Beaumont in favor of Corpoven.
 
 
 7
 Beaumont contracted with Torm to ship the cargo, entering into a charter party that obligated Beaumont to pay all freight and related transportation charges. The ship's master signed three bills of lading on Corpoven's standard bill of lading form, issued to the "order of ... Paribas ... notify Beaumont...." The bills of lading did not specify who was to pay freight charges.
 
 
 8
 The cargo left Venezuela aboard Torm's ship, the TORM ROTNA, on May 27, 1986, headed for New York harbor. Beaumont exercised its right, however, to redirect the ship. The TORM ROTNA ultimately discharged the cargo at Portland, Oregon, pursuant to Beaumont's directions. As the cargo approached Portland, Beaumont entered into a storage contract with Time Oil Co. ("Time" or "the warehouse"), in which Beaumont warranted that it was the "sole legal and beneficial owner" of the cargo and that Paribas was a lienor.
 
 
 9
 After Beaumont advised Paribas that it intended to store the cargo at Time, the bank sought financial information about the warehouse. Paribas also obtained information from its own sources that Time "is not very professional in their dealings". The bank subsequently instructed Beaumont "to take all necessary steps to send M/T 'Torm Rotna' for discharge of the product at any GATX terminal on the west coast." After Beaumont advised Paribas that no alternate storage was available and that demurrage aboard the TORM ROTNA was $9,000 per day, Paribas ultimately "released" the cargo and it was stored at Time.
 
 
 10
 On June 17, 1986, when the cargo arrived at Portland, Beaumont did not yet have in its possession the bills of lading that would have permitted discharge of the cargo. The charter party between Torm and Beaumont, however, provided that the cargo could be off-loaded if Beaumont issued a "letter of indemnity" to Torm, which would be voided upon presentation to Torm of the full sets of original bills of lading. The letter of indemnity, which was joined in by Paribas, provided that Beaumont and Paribas agreed to indemnify Torm "and hold you harmless in respect of any liability, loss or damage of whatsoever nature which you may sustain by reason of delivering the cargo to receivers in accordance with our request." In accordance with the terms of the parties' agreement, the agreement to indemnify ceased upon presentation of the bills of lading.
 
 
 11
 Torm discharged the cargo into Time's storage tanks. Paribas instructed Time to issue a warehouse receipt to Paribas and not to remove the gasoline without authorization from Paribas. Beaumont arranged sales. Paribas reviewed and approved the release of the gasoline to third party purchasers, received the purchase price of various parcels of the gasoline, and applied all proceeds of the sales to reduce Beaumont's indebtedness to the bank.
 
 
 12
 On June 24, Time requested permission from Paribas to regrade a portion of the gasoline as "leaded." This involved the addition of lead to the gasoline and was intended to make the product more marketable. Paribas authorized the regrade. Several other lots of gasoline likewise were regraded with the bank's authorization.
 
 
 13
 The proceeds of the gasoline sales were insufficient to repay Paribas for the sum collected by Corpoven pursuant to the letter of credit, so that Paribas had to execute on a fiduciary deposit maintained by Beaumont at the bank in order to ensure that the debt was paid in full. No transportation expenses were ever paid to Torm.
 
 
 14
 In July 1986, Torm commenced this action to recover shipping charges, which action ultimately was transferred to the Southern District of New York. Both Beaumont and Paribas were named as defendants. Beaumont, however, did not appear, and the record does not reflect any efforts by Torm to recover from Beaumont. Rather, Torm has directed its efforts to recovering from the bank. In 1988, both Torm and the bank moved for summary judgment. The parties entered into a stipulation providing that "the parties deem this case to have been tried to the court based upon the present record and that this matter should be considered submitted to the Court for decision on all factual and legal issues."
 
 
 15
 The court heard oral argument and ultimately granted summary judgment to Torm. Although the court found that the bank did not enter into an agreement by which it became obligated to pay for the shipping costs, and found further that the bank did not "accept" the cargo, it found that Paribas exercised "dominion and control" over the cargo so that a promise to pay the freight charges could be implied. The court relied on the following factors in reaching its decision: that Paribas (1) required that it be named as consignee on the bill of lading; (2) co-signed the letter of indemnity; (3) imposed conditions on the storage of the cargo at Time; (4) authorized the sale of gasoline and applied the proceeds to reduce Beaumont's debt; (5) authorized Time to regrade the gasoline; and (6) benefited from Torm's services.
 
 
 16
 This appeal followed. The American Bankers Association filed an amicus curiae brief, arguing that the court's imposition of shipping costs on a mere secured creditor would wreak havoc in the international banking community.
 
 II.
 
 17
 As a threshold matter, we address the propriety of exercising jurisdiction and set forth the relevant standard of review.
 
 
 18
 We hold that we have jurisdiction over the instant appeal in that the order and judgment appealed from are final within the meaning of 28 U.S.C. Sec. 1291 (1988).
 
 
 19
 In evaluating the claims raised, we start with the proposition that the district court's findings of fact should not be set aside unless clearly erroneous. Fed.R.Civ.P. 52(a); Amadeo v. Zant, 486 U.S. 214, 223, 108 S.Ct. 1771, 1777, 100 L.Ed.2d 249 (1988); Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). On the other hand, the court's use of facts to determine that Paribas was liable for shipping costs involves conclusions of law that are subject to de novo review. See Lever Bros. v. American Bakeries Co., 693 F.2d 251, 255 n. 4 (2 Cir.1982).
 
 III.
 
 20
 With the foregoing in mind, we believe it is necessary and appropriate, at this stage, briefly to set forth the guiding norms relevant to the imposition of freight charges. It has long been established that the primary obligation to pay shipping costs rests with the shipper, rather than with the consignee. Louisville & N.R.R. v. Central Iron & Coal Co., 265 U.S. 59, 67, 44 S.Ct. 441, 442, 68 L.Ed. 900 (1924); States Marine Int'l, Inc. v. Seattle-First Nat'l Bank, 524 F.2d 245, 247 (9 Cir.1975). The reason for this is that "the shipper is presumably the consignor; the transportation ordered by him is presumably on his own behalf." Louisville & N.R.R., supra, 265 U.S. at 67. 44 S.Ct. at 442. "It is only when there is some binding obligation on the part of the consignee to pay freight charges that the courts will look beyond the shipper's primary responsibility." States Marine, supra, 524 F.2d at 247.
 
 
 21
 Such a binding obligation to pay freight charges may arise pursuant to statute or pursuant to a contractual obligation. Id. at 247-48. In the instant case, there is no intimation that Paribas has any statutory obligation to pay freight. Cf. Interstate Commerce Act, 49 U.S.C. Sec. 10744 (1988) (setting forth liability for the payment of rates in interstate, but not international, commerce).
 
 
 22
 In the absence of a statutory obligation, "it is necessary to determine whether, under the applicable law, there may be an enforceable contract obligation." States Marine, supra, 524 F.2d at 248. "To ascertain what contract was entered into we look primarily to the bills of lading, bearing in mind that the instrument serves both as a receipt and as a contract." Louisville & N.R.R., supra, 265 U.S. at 67. 44 S.Ct. at 442. Torm urges, on its cross-appeal, that the district court erred in concluding that Paribas did not enter into an agreement to pay freight. We hold, to the contrary, that the district court's conclusion in this regard was correct. Although the bill of lading was issued "to the order of ... Paribas ... notify Beaumont" and listed the freight rate as "as agreed," the bill of lading stood mute as to who was to pay the freight. The charter party, however, clearly obligated Beaumont in that respect.
 
 
 23
 Despite Beaumont's primary responsibility to pay freight, however, and the fact that Paribas was neither statutorily nor expressly contractually obligated to do so, we must make a third inquiry. That is, we must look to the conduct of Paribas to see whether a promise to pay the freight "may be implied." States Marine, supra, 524 F.2d at 248. In determining whether such an implied obligation exists, we are guided by longstanding principles. Over seventy years ago, for example, the Supreme Court noted that, at common law, "[t]he weight of authority seems to be that the consignee is prima facie liable for the payment of the freight charges when he accepts the goods from the carrier." Pittsburgh, C.C. & St. L. Ry. v. Fink, 250 U.S. 577, 581, 40 S.Ct. 27, 27-28, 63 L.Ed. 1151 (1919) (emphasis added). Twelve years later, we stated that "[i]t has been authoritatively established that a consignee who receives the goods becomes legally bound to pay the freight charges." Dare v. New York Cent. R.R., 20 F.2d 379, 380 (2 Cir.1927). More recently, but still invoking the seemingly timeless authority of Fink, the Ninth Circuit stated in States Marine, supra, that "[t]he most obvious indication of a consignee's implied agreement to pay freight charges occurs when he accepts the goods himself, indicating that they are his own and not the shipper's." 524 F.2d at 248.
 
 
 24
 In Dare, supra, we held that secured creditors who received goods were liable for freight charges, even though not named as consignees, because "[s]o far as [the carrier] knew, the [creditors] were owners of the shipment." 20 F.2d at 380. The creditors held order bills of lading duly endorsed by the named consignees. Id. Torm invokes Dare as support for the proposition that there is no "exception" that per se protects secured creditors from being liable for shipping charges. Essential to Dare, however, was the fact that the secured creditor received the goods. As we explicitly stated, "[w]e see no reason why the holder should not stand in the shoes of the consignee in respect to the obligation to pay freight upon delivery of the goods to him." Id. (emphasis added). The district court in the instant case explicitly found that Paribas did not "accept the goods." Accordingly, Torm's reliance on Dare is misplaced. Furthermore, although Torm urges on its cross-appeal that Paribas did accept the goods, we do not find the district court's factual finding to the contrary to be clearly erroneous.
 
 
 25
 "Even where there is no actual acceptance of the goods," however, "presumptive ownership may arise from [a party's] exercise of dominion and control over the shipment." States Marine, supra, 524 F.2d at 248. It is on the doctrine of presumptive ownership that the instant appeal turns.
 
 IV.
 
 26
 Both the parties and the district court took States Marine as the obvious point of departure for this case. Since the parties urge significantly different interpretations of States Marine, we believe it is necessary to set forth in some detail the facts and reasoning of that short but important opinion.
 
 
 27
 In States Marine, freight charges resulted from two shipments of canned salmon from Alaska to Washington; the carrier, States Marine, sued both the shipper, Royal Red Seafoods, Inc. ("Royal") and Seattle-First National Bank ("Seattle-First"). States Marine Int'l, Inc. v. Seattle-First Nat'l Bank, 524 F.2d 245, 246 (9 Cir.1975).
 
 
 28
 Royal and Seattle-First had entered into a security agreement and general pledge, in order to finance Royal's canning operations for the 1970 fishing season. Under that agreement, Seattle-First acquired "a security interest in all of Royal's property, including canned salmon." Id. at 246. Financing statements were filed in Washington and Alaska. Id. A Royal employee prepared a "straight bill of lading" on a form supplied by States Marine. Following the printed words "Consigned to" there was inserted "Seattle First National Bank c/o Royal Red Seafoods, Inc.," followed by Royal's Seattle address. On the second shipment, the consignee was designated as "Seattle First National Bank--account of Royal Red Seafoods, Inc.," followed by the same Seattle address. Each bill contained a heading "Address Arrival Notice To" followed by Royal's name and address. Id. Counsel in States Marine prepared findings of fact, endorsed by the district court, that included the following:
 
 
 29
 " 'The inclusion of Bank as a named party to the bills of lading was a voluntary act of Royal and was inserted without the permission of Bank. Bank did not receive copies of the bills of lading and had no knowledge of the fact that Royal had inserted Bank as a named party on the bills of lading.' "
 
 
 30
 Id. at 247 (quoting district court's findings of fact). Both salmon shipments were to be delivered to warehouses at the ports of Seattle and Bellingham, Washington, respectively. Id. at 246.
 
 
 31
 Seattle-First " 'did not at any time material exercise any control over the movement of the goods from Alaska to Washington....' " Id. at 247 (quoting district court's findings of fact). Pursuant to the bills of lading, arrival notices were sent to Royal, notifying it that "its goods had been delivered and were being held in the warehouses." Id. at 246. The warehouses issued negotiable warehouse receipts, indicating receipt of the cargo " 'for the account of "Seattle-First National Bank Acct. Royal Red Seafoods, Inc." Said Documents do not contain any obligation of Bank to pay any freight charges and Bank did not author, direct or prepare the phraseology, verbage [sic] or content thereof.' " Id. at 247 (quoting district court's findings of fact).
 
 
 32
 In accordance with the agreement between Royal and Seattle-First, the salmon was warehoused as follows:
 
 
 33
 "negotiable warehouse receipts were issued by the warehouses to the Bank for the loan account of Royal. The salmon remained in the warehouses until Royal was able to conclude sales agreements with its customers, at which time Royal notified the Bank of the sales, and the Bank then instructed the warehouses to release the goods for sale through documents known as Banker's Orders. The proceeds from the sales of the salmon were forwarded to the Bank under a trust receipt arrangement."
 
 
 34
 Id. at 246-47.
 
 
 35
 Even though, as in the instant case, Seattle-First was named on warehouse receipts; authorized sales; and applied sale proceeds to reduce the shipper's debt to it, the court held that the bank's acts were "more indicative of a security interest than ownership...." Id. at 249. There was no evidence that the bank there "engaged in any of the selling operations or participated in any profits from the sales. The benefits received by the Bank from the salmon sales were as a creditor receiving interest on its loans." Id. at 249. Moreover, even though the bank had been named consignee by the shipper, the court stated that it was "undisputed that the Bank had no knowledge that it was named by Royal as consignee in the bills of lading." Id. at 248-49. Ultimately, the court held that the bank could not be held liable for the shipping costs:
 
 
 36
 "When the goods arrived, notices were sent to Royal pursuant to instructions in the bills of lading, and no notice was sent to the Bank. Thereafter, the Bank was treated and acted at all times as a secured creditor, following standard commercial practices, and not as an owner of the goods."
 
 
 37
 Id. at 249.
 
 V.
 
 38
 The critical inquiry in the instant case, as in States Marine, is whether the actions undisputedly taken by the bank were sufficient to confer it with the status of a presumptive owner. It is to that inquiry that we now turn.
 
 
 39
 Paribas and the amicus argue that the bank's actions here, like those of the bank in States Marine, simply were consistent with Paribas' status as a secured creditor and did not make it liable for freight charges. Paribas argues that the court foisted liability upon it in a situation where a secured creditor traditionally would not have been liable and without making the critical determination that Paribas was the "presumptive owner" of the goods. In arguing that it was simply a secured creditor rather than the owner, Paribas relies heavily on Beaumont's ability to direct the TORM ROTNA, the fact that Beaumont itself arranged sales of the gasoline to third parties, and the fact that the bank did not stand to gain the profits of the sales (over and above its loan to Beaumont).
 
 
 40
 Although the district court did not explicitly invoke the doctrine of "presumptive ownership" in declaring Paribas liable for freight, we think it is clear that that is the theory upon which the court implicitly relied. The district court's imposition of liability on the secured creditor, however, under these circumstances appears to be unprecedented. It is a result we cannot sanction. This is not a case where the bank accepted the goods or otherwise acted in a manner that would have led to its anticipating liability.
 
 
 41
 (A)
 
 
 42
 The factors relied upon by the district court do not sufficiently distinguish it from States Marine so as to justify its contrary holding.
 
 1. Being Named on the Bills of Lading
 
 43
 The district court relied heavily on the fact that "defendant here, unlike the bank in States Marine, required that it be named as consignee on the bills of lading." The fact that Paribas was listed on the bills of lading at its own behest, however, does not compellingly distinguish its action from those of Seattle-First. As Paribas points out, States Marine involved a shipment from one state (Alaska) to another state (Washington), and thus was governed by the Uniform Commercial Code ("U.C.C."). In order to perfect its security interest, the bank there needed only to make the appropriate U.C.C. filings in both Washington and Alaska, which it did. States Marine Int'l, Inc. v. Seattle-First Nat'l Bank, 524 F.2d 245, 246 (9 Cir.1975).
 
 
 44
 In this case, however, the disputed shipment originated in Venezuela and was not governed by the U.C.C. at the commencement of the voyage. It was not unreasonable or inconsistent with its role as a secured creditor for Paribas to be named on the bills of lading under these circumstances. Schoenbaum, Admiralty & Maritime Law 300 (1987) ("An intermediary bank that extends credit is fully protected by becoming a consignee or by retaining possession of the bill [of lading]"). Indeed, it is not uncommon for banks to be named on bills of lading. Commercial Trading Co. v. Hartford Fire Ins. Co., 466 F.2d 1239, 1241 n. 3 (5 Cir.1972) ("In quite an ordinary financial arrangement, Commercial advanced the sums needed for the purchases by arranging letters of credit through the Trade Bank and Trust Company of New York. As is customary, these letters of credit required that the ... seller/shipper draw the bills to the order of Trade and Trust, which upon receipt of the bill from the seller's ... bank charged Commercial's account for the amount of the accompanying drafts." (emphasis added)).
 
 
 45
 A bank being named on the bill of lading does not mean that the bank is the owner of the goods. Mississippi Valley Barge Line Co. v. Bulk Carriers, Ltd., 249 F.Supp. 743, 745 (S.D.N.Y.1965) ("The Dori was loaded in Germany, at which time bills of lading were issued by the Master covering the carriage of the cargo to New Orleans and delivery there to the order of Franklin National Bank notify Impex. It must be assumed that the delivery provisions in the bill of lading were on instructions of Nimpex, charterer of the Dori. In an affidavit, it is stated that Impex was the owner of the cargo." (emphasis added)).
 
 2. Co-signing the Letter of Indemnity
 
 46
 In a footnote, the district court found that "[t]he letter of indemnity was vacated once the original bills of lading appeared and hence played no substantive part in the developing relationship between plaintiff, Beaumont Oil Ltd., and defendant. It has, however, some significance in evidencing the continuing activist role played by defendant." While we agree with the district court's prefatory sentence, we are constrained to disagree that any "significance" that attached to Paribas' "activist role" was enough to impose liability on the bank.
 
 
 47
 We agree with Paribas that the proper inquiry was not whether the secured creditor was "active," but rather whether its activity was indicative of an ownership interest. Signing the letter of indemnity did not rise to that level. The letter of indemnity simply protected Torm from any liability for releasing the cargo. It is unremarkable that Paribas, which had a security interest in the cargo, joined in that letter.
 
 
 48
 3. Imposing Conditions on Warehousing the Cargo at Time
 
 
 49
 The district court stated that, while Paribas ultimately permitted the oil to be stored at Time, "it imposed certain conditions on this storage," including that it be issued warehouse receipts and that the cargo not be removed without Paribas' authorization. These actions again were simply consistent with Paribas' status as a secured creditor. Its possession of warehouse receipts was prudent in light of its security interest. For example, according to the explicit terms of the U.C.C.;
 
 
 50
 "During the period that goods are in the possession of the issuer of a negotiable document therefor, a security interest in the goods is perfected by perfecting a security interest in the document, and any security interest in the goods otherwise perfected during such period is subject thereto."
 
 
 51
 Uniform Commercial Code Sec. 9-304(2) (1972). See also Clark, The Law of Secured Transactions Under the Uniform Commercial Code p 7.13 (2d ed. 1980) (addressing field warehousing) ("In order to maintain control over the inventory in the field warehouse, the warehouse company hires and bonds a manager.... The warehouse company then issues non negotiable receipts, which normally run to the secured party as consignee." (emphasis added)).
 
 
 52
 The process by which Paribas authorized sales also was consistent with its role as a secured creditor. Notably, the bank in States Marine did precisely what Paribas did here--i.e., receive a warehouse receipt and then authorize sales. It is difficult to improve upon the court's statement in that case, where the facts closely paralleled those of the instant case:
 
 
 53
 "The Banker's Orders authorizing the warehouse to release the [cargo] as [shipper] sold it were standard devices in warehouse receipt financing. Since the goods were subject to the Bank's security interest, they could not be sold without the Bank releasing that interest."
 
 
 54
 States Marine, supra, 524 F.2d at 249.
 
 
 55
 4. Authorization of Sales and Application of Monies to Reduce Beaumont's Debt
 
 The district court found that:
 
 56
 "As Beaumont Oil Inc. arranged the sales of portions of the stored oil it first requested that defendant release a certain amount of the oil to a certain purchaser, and defendant then authorized Time to release the amount of oil requested by Beaumont to that party; the receipts of these sales were received by defendant and applied against Beaumont Oil, Inc.'s and Beaumont Oil Ltd.'s debt to defendant."
 
 
 57
 Here, as in States Marine, supra, however,
 
 
 58
 "There is no evidence that the Bank engaged in any of the selling operations or participated in any profits from the sales. The benefits received by the Bank from the [cargo] sales were as a creditor receiving interest on its loans."
 
 
 59
 524 F.2d at 249.
 
 5. Authorization of Regrade
 
 60
 The district court stated that "[o]n June 26, 1986 defendant authorized Time to regrade the stored oil." We agree with Paribas and the amicus that this factor is not indicative of an ownership interest. As both point out, where the value of a bank's collateral is dependent upon the collateral's classification, banks have always acted to ensure that the collateral is not reclassified into an unsalable form, which would render their collateral worthless.
 
 6. Benefiting from Torm's Services
 
 61
 The district court, somewhat cryptically, found that "[d]efendant clearly benefitted from plaintiff's services. Even assuming that defendant did not fully recover the amount of its loan to Beaumont ... defendant's losses would have been even greater had not plaintiff delivered the oil." If the court meant that Torm's transportation of cargo somehow benefitted Paribas, this contingency is irrelevant to the question whether Paribas acted as a presumptive owner. It was Beaumont, not Paribas, that made transportation arrangements and directed the course of the TORM ROTNA. If the court meant that Paribas benefited from the cargo sales, that benefit, as stated above, was "as a creditor receiving interest on its loans." States Marine, supra, 524 F.2d at 249.
 
 
 62
 (B)
 
 
 63
 Having carefully considered all of the factors relied upon by the district court, we are persuaded that it erred in imposing liability upon Paribas. As the court concluded in States Marine, supra, the bank simply cannot be held liable for shipping charges under the circumstances of this case:
 
 
 64
 "[T]here [is no] evidence that [the carrier] was misled by any act of the Bank. It is significant also that [carrier] sent its bills for the shipping charges to [shipper] and not to the Bank.
 
 
 65
 ... Nor is there evidence of acts of dominion or control by the Bank sufficient to create a presumptive ownership and implied obligation to pay the shipping charges."
 
 
 66
 Id.
 
 
 67
 The amicus points out that "Paribas was acting in accordance with standard commercial banking practices and the customary practice of all secured creditors by being named as the order party in the bill of lading and by monitoring its collateral." Paribas explicitly raises the disturbing and not unrealistic specter of carriers routinely going after "deep pocket" financial institutions rather than shippers if it as a secured creditor is found liable in this case. We agree that the district court applied the law to the facts of this case in a manner which, if allowed to stand, would subject the entire banking industry to a vast area of liability simply for following commonplace and prudent commercial banking practices.
 
 
 68
 As two learned commentators have stated, a creditor's interest rate is based upon a risk calculation:
 
 
 69
 "A potential creditor wants to know whether and to what extent any security interest he takes in specific property of his debtor will have priority over other claims to that property. To the extent that the creditor is uncertain about the priority of his security interest, and thus about whether he will recover his loan in full if the debtor defaults, he will require a higher interest rate from the debtor."Baird & Jackson, Possession and Ownership: An Examination of the Scope of Article 9, 35 Stan.L.Rev. 175, 175 (1983). In this case Paribas took aggressive steps to protect its security interest, and presumably it set an interest rate with those steps in mind. Paribas acted in a manner consistent with and accepted in international commercial transactions and did not enter into that transaction with the expectation that it was potentially subject to freight liability; it did not set an interest rate with that contingency in mind. We will not punish Paribas for acting as a prudent creditor nor force future creditors involved in admiralty transactions to choose between acting passively, with the risk of losing a security interest, and acting aggressively, with the risk of being liable for freight charges. We will not create that modern-day Scylla and Charybdis. There are enough perils on the high seas.
 
 VI.
 To summarize:
 
 70
 We hold that we have jurisdiction over the instant admiralty appeal. It has long been established that carriers are primarily liable for shipping charges. A court should look beyond the carrier's primary obligation only pursuant to statutory or contractual obligations, or if the conduct of another party gives rise to an implied obligation to pay freight. In States Marine Int'l, Inc. v. Seattle-First Nat'l Bank, 524 F.2d 245, 246 (9 Cir.1975), the leading case in this area, the court held that a bank's actions with respect to cargo were not indicative of ownership and thus did not give rise to liability for freight charges. Likewise, in the instant case the bank acted as a secured creditor rather than as the presumptive owner of cargo. Accordingly, the district court erred in imposing an obligation to pay freight upon the bank. Moreover, we are not persuaded by the additional bases for imposing liability urged by the carrier on its cross-appeal.
 
 
 71
 Reversed.