The **BANKRUPTCY ESTATE OF UNITED SHIPPING COMPANY, INC., Appellant, (C2–91–402)**

v.

**TUCKER COMPANY, Respondent. (C2–91–402).**

**UNITED SHIPPING COMPANY, INC., Appellant, (C5–91–457)**

v.

**NATIONAL AUTOMOTIVE & RUBBER MARKETING, INC. d/b/a N.A.R.M. Transportation Brokerage, Respondent. (C5–91–457).**

**Nos. C2–91–402, C5–91–457.**

Court of Appeals of Minnesota.

Aug. 27, 1991.

Review Denied Oct. 31, 1991.

Thomas E. Wolff, Snelling Christensen & Briant, P.A., Minneapolis, for United Shipping Co., Inc.

Barbara R. Kueppers, Minneapolis, for Tucker Co.

Forrest M. Anderson, Harper & Anderson, Chtd., Cottage Grove, for Nat. Automotive & Rubber Marketing, Inc.

Considered and decided by CRIPPEN, P.J., and NORTON and SHORT, JJ.

## OPINION

SHORT, Judge.

On appeal from separate grants of summary judgment, United Shipping Company, Inc. (U.S.C.) argues the trial court erred in (1) concluding it had a contract carrier relationship with Tucker Company; and (2) holding neither Tucker nor National Automotive & Rubber Marketing, Inc. (N.A.R.M.) were responsible for freight undercharges because both companies were transportation brokers; and (3) failing to hold both brokers have waived their rate reasonableness defenses. We disagree and affirm as to Tucker, but remand the N.A.R.M. action for resolution of a material issue of fact.

## FACTS

The Interstate Commerce Act (ICA) requires motor common carriers to file their transportation rates with the Interstate Commerce Commission (ICC) and to charge all customers these filed rates. However, during the mid–1980's, many common carriers charged rates lower than their filed rates. When these common carriers went bankrupt, bankruptcy trustees discovered the discrepancies between the filed and charged rates and sued customers to recov-

er the undercharges. The Supreme Court recently reaffirmed that as the ICA requires the filed rate to be paid for all common carriage, a shipper is liable for freight undercharges. *See Maislin Indus., U.S. v. Primary Steel, Inc.,* —— U.S. ——, ——, 110 S.Ct. 2759, 2768, 111 L.Ed.2d 94 (1990).

### U.S.C./N.A.R.M. FACTS

U.S.C., an ICC-licensed motor common carrier, transported freight for N.A.R.M., an ICC-licensed transportation broker, under its common carrier authority from May 1985 to September 1987. Transportation brokers arrange transportation for consignors, consignees, and carriers. N.A.R.M. was not listed as either the consignor or consignee on any bill of lading, but was listed on U.S.C. invoices as the payor or "bill to" party.

After U.S.C. declared bankruptcy in February 1988, bankruptcy auditors discovered the freight charges paid by N.A.R.M. were significantly lower than the rates U.S.C. had filed with the ICC. On November 22, 1989, U.S.C. sued N.A.R.M. for $22,477.51 of undercharges. N.A.R.M. filed a motion seeking to refer the case to the ICC for a rate-reasonableness hearing and submitted evidence showing U.S.C.'s filed rates were 16 to 59 percent higher than the negotiated rates. N.A.R.M. also served an untimely response to U.S.C.'s request for admissions. The parties filed cross-motions for summary judgment. On November 23, 1990, the trial court granted summary judgment for N.A.R.M. on grounds that transportation brokers are not liable for undercharges. The trial court also determined rate reasonableness could not be raised as a defense in an undercharge case.

### U.S.C./TUCKER FACTS

In anticipation of ICC approval of U.S.C.'s contract carrier license, U.S.C. and Tucker, an ICC-licensed broker, signed a carriage agreement. U.S.C. agreed to provide equipment and drivers to transport freight for Tucker according to "the schedule of rates agreed to by the two parties."

In the event a shipper did not pay freight charges, the agreement provided U.S.C. and Tucker would mutually proceed against the shipper to recover those charges. U.S.C. received its contract carrier license in September 1985.

From September 1985 until December 1987, U.S.C. transported goods for Tucker under their agreement. U.S.C. provided Tucker with special services to meet Tucker's distinct needs during these years including short notice truck availability, irregular route service, appointment deliveries, driver loading, stop-offs in transit for partial unloading, and prioritizing of available loads. Rates were negotiated over the telephone and confirmed by written invoices. U.S.C. expected Tucker to give the carrier a substantial number of shipments, and U.S.C. carried 5 to 10 loads per month for Tucker.

Tucker was not listed as the shipper or the receiver on any bill of lading. For all shipments at issue in this case, Tucker collected the agreed-upon freight charges from the shipper, transmitted the negotiated rate to U.S.C., and kept the difference between the two fees. Consequently, Tucker was listed on U.S.C.'s invoices as the payor or "bill to" party.

After U.S.C. went bankrupt in February 1988, bankruptcy auditors determined the rates Tucker paid for transportation were lower than U.S.C.'s filed rates. U.S.C. sued Tucker on November 10, 1989, for $58,112.54 in undercharges. The parties filed cross-motions for summary judgment. On November 23, 1990, the trial court granted summary judgment for Tucker on the grounds that U.S.C. and Tucker had a contract carrier relationship, so Tucker was not liable for the common carriage filed rate. In the alternative, the trial court referenced its summary judgment order in *U.S.C. v. N.A.R.M.* which held that transportation brokers were not liable for undercharges.

### ISSUES

I.  Did the trial court err in determining U.S.C. hauled freight for Tuck-

er under its contract carrier authority?

II. Did the trial court err in determining transportation brokers are not responsible for freight undercharges?

III. Has either Tucker or N.A.R.M. waived its rate-reasonableness defense?

## ANALYSIS

■ On appeal from a grant of summary judgment, we must determine whether any genuine issues of material fact exist and whether the trial court erred in its application of the law. *Offerdahl v. University of Minn. Hosps. and Clinics,* 426 N.W.2d 425, 427 (Minn.1988). We must view the evidence in the light most favorable to the non-moving party, *id.,* but need not defer to the trial court's application of the law. *See Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984).

### I.

■ A motor contract carrier is:

a person providing motor vehicle transportation of property for compensation under continuing agreements with one or more persons—(i) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or (ii) designed to meet the distinct needs of each such person.

49 U.S.C. § 10102(15)(B) (1990) (one of two definitions). Contract carriers do not have to charge each shipper the filed rate because motor contract carriers of property are exempt from the ICA's rate filing requirements. *See Central & S. Motor Freight Tariff Ass'n v. United States,* 757 F.2d 301, 330 (D.C.Cir.1985), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). Agreements creating contract carriage:

shall be in writing, shall provide for transportation for a particular shipper or shippers, shall be bilateral and impose specific obligations upon both carrier and shipper or shippers, shall cover a series of shipments during a stated period of time in contrast to contracts of carriage covering individual shipments, and copies of which contracts or agreements shall be preserved by the carriers parties thereto so long as such contracts or agreements are in force and for at least one year thereafter.

49 C.F.R. § 1053.1 (1988).

■ "[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). "[I]t is not [the ICC's] policy to find a lack of contract carriage based on simple, technical oversights or omissions." *Contracts for Transportation of Property, Ex parte No. MC–198,* at 5 (ICC Feb. 20, 1991) (1991 Westlaw 62174). While one might expect to find contract terms such as shipment destinations, equipment to be provided, and freight volume in an agreement creating contract carriage, these provisions are not required to create contract carriage. *See id.* at 4. Instead, the Commission evaluates all evidence in the record to determine whether contract carriage has been created. *Id.* at 5. Once contract carriage is created, technical deficiencies in the agreement purporting to create contract carriage do not convert contract carriage to common carriage. *See id.; accord ETS–Hokin & Galvan, Inc. v. Maas Transport, Inc.,* 380 F.2d 258, 260–61 (8th Cir.1967) (since ICA does not show Congress intended to void private contracts which violate the Act, plaintiff's failure to file rates as required by ICA did not void private contract and carrier could collect agreed-upon rate), *cert. denied,* 389 U.S. 977, 88 S.Ct. 481, 19 L.Ed.2d 471 (1967); *Concord Indus., Inc. v. K.T.I. Holdings, Inc.,* 711 F.Supp. 728, 730 (E.D.N.Y.1989) (carrier's failure to acquire ICC carrier or broker license did not void contract). *But cf.* Hardman, *Motor Contract Carriage in the 1980s and 1990s: An Odyssey Towards Total Legislative Deregulation,* 58 Transp.Prac.J. 206, 214 (1991) (pointing out that dual common and contract carriage was not involved in these cases and decision was between "no payment" and "agreed upon payment").

■ Here, U.S.C. argues its contract with Tucker was insufficient to create contract carriage; therefore, the freight involved moved under U.S.C.'s common carrier authority and U.S.C. is entitled to collect the filed common carrier rate. We disagree. The evidence in the record shows the parties intended to form a contract giving Tucker services not available to the general shipping public. *Cf. Ex parte* No. MC–198 at 4.[1] (common carriage is the service available to the general shipping public). U.S.C.'s former manager outlined Tucker's distinct needs which U.S.C. met under the contract. *See* 49 U.S.C. § 10102(15)(B). These special practices were incorporated into the contract by reference, as were transportation rates. The contract in this case was more detailed than the documents at issue in cases where the ICC found common—not contract—carriage had been created. *See MCI Telecommunications Corp. v. E.L. Murphy Trucking Co.*, No. MC–C–30115 (ICC June 22, 1989), 1989 Fed.Carr.Cas. (CCH) ¶ 37,748.02 (1989 Westlaw 238880) (purchase order); *Diversey Wyandotte Corp.*, No. 40342 (ICC June 4, 1990) 1990 Fed.Carr.Cas. (CCH) ¶ 37,821.02 (1990 Westlaw 288233) (discount pricing list). Further, the parties understood the contract imposed specific obligations on both Tucker and U.S.C.; Tucker was to find customers for U.S.C. and U.S.C. would haul their freight. The parties' course of dealing shows Tucker met its obligation by finding several customers for U.S.C. Finally, although the duration of the contract was not specified, the contract language shows the parties contemplated a lengthy relationship and, in fact, operated under the contract for almost three years. Given these circumstances, the contract between U.S.C. and Tucker was sufficient to create contract carriage under *Ex parte* No. MC–198.

■ Even if the contract technically violated ICA requirements, its deficiencies were not sufficient to transform the parties' contractual relationship into common carriage. Here, the provision of special services not available to the general shipping public shows the parties intended to form a contract to govern their relationship. *Cf. Ex Parte* No. MC–198 at 4 (the service available to the general shipping public is common carriage); *Ensco, Inc. v. Weicker Transfer and Storage Co.*, 689 F.2d 921, 925 (10th Cir.1982) (determine carrier's status by reference to what it holds itself out to be). Since the parties formed this contract, a technical violation of the ICA neither voids the contract nor transforms contract carriage to common carriage. *See Ex Parte* No. MC–198 at 5; *ETS–Hokin*, 380 F.2d at 260–61. Consequently, the trial court properly found Tucker was not liable for the common carriage filed rate because it had a contract carriage relationship with U.S.C.

## II.

■ It is well settled the primary obligation to pay transportation costs rests with the consignor and the secondary obligation with the consignee of goods. *Louisville & N. R. Co. v. Central Iron & Coal Co.*, 265 U.S. 59, 67, 44 S.Ct. 441, 443, 68 L.Ed. 900 (1924); *see* 49 U.S.C. § 10744 (1990). Primary liability for freight charges may be shifted to a third party, but the transfer must arise pursuant to statute or clearly be established in the parties' contract or course of dealing. *See Louisville*, 265 U.S. at 67, 44 S.Ct. at 443; *A/S Dampskibsselskabet Torm v. Beaumont Oil Ltd.*, 927 F.2d 713, 717 (2d Cir. 1991); *Missouri Pac. R.R. Co. v. Center Plains Indus. Inc.*, 720 F.2d 818, 819 (5th Cir.1983).

■ Neither the ICA nor ICC regulations shifts liability for unpaid freight charges to a transportation broker.[2] "The

---

**1.** U.S.C. argues *Ex parte* No. MC–198 cannot be applied to the present case because it was not the law in effect during the contract's term. However, *Ex parte* No. MC–198 is applicable to this case because the ICC merely was clarifying misinterpretations of its earlier decisions, not reversing those decisions.

**2.** ICC regulations provide when a broker acts for "a person bound by law or a Commission regulation as to the transmittal of bills or payments, the broker must also abide by the law or regulations which apply to that person." 49 C.F.R. § 1045.10. This provision does not transfer liability for unpaid freight costs to a trans-

bill of lading is the basic transportation contract between the shipper-consignor and the carrier; its terms and conditions bind the shipper and all connecting carriers." *Southern Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 342, 102 S.Ct. 1815, 1820, 72 L.Ed.2d 114 (1982). Thus, a broker may assume liability for freight charges by so stating on the bill of lading. *See id.* at 343, 102 S.Ct. at 1820; *Missouri Pac.*, 720 F.2d at 819; *Motor Carrier Audit & Collection Co. v. Freight Line, Inc.*, No. CA3–87–2503–R, slip op. at 3, 1988 WL 236363 (N.D.Tex. June 9, 1988).

■ Tucker and N.A.R.M. argue liability for freight costs may be shifted only on the bill of lading. We disagree. A broker and a carrier may alter the presumption raised by the bill of lading by agreeing to shift primary responsibility for freight charges from the shipper. *See In re Roll Form Prods., Inc. (Roll Form Prods., Inc. v. All State Trucking Co.)*, 662 F.2d 150, 154 (2d Cir.1981) (absent discriminatory practices, parties are free to allocate freight charges by contract). The transfer of primary responsibility for freight costs may be established in a written contract or inferred from the parties' conduct. *See Missouri Pac.*, 720 F.2d at 819, (shift in responsibility for payment should be shown by a writing or by circumstances surrounding the receipt and transportation of goods); *Covey v. ConAgra, Inc.*, 763 F.Supp. 479, 483 (D.Colo.1991) (court may look to who hired or delivered goods to the carrier); *Atlantis Express, Inc. v. Unicorn Transp. Systems, Inc.*, 764 F.Supp. 135, 138 (D.Minn.1991) (person who bills and collects freight charges assumes liability); *Farrell Lines Inc. v. Titan Indus. Corp.*, 306 F.Supp. 1348, 1351 (S.D.N.Y.1969) (carrier released shipper from primary liability by extending credit to freight for-

warder), *aff'd*, 419 F.2d 835 (2d Cir.1969), *cert. denied*, 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970); *Sovran Bank/Southeast v. ICB Transp. Servs., Inc.*, —— B.R. ——, No. Civ. 3–89–250 (E.D.Tenn.1990) 1990 Fed.Carr.Cas. ¶ 83,-569 (broker assumed liability for freight charges it collected from shipper).

■ U.S.C. argues N.A.R.M. and Tucker assumed liability for undercharges when these brokers collected freight costs from shippers and transmitted them to U.S.C.[3] We disagree. Mere transmittal of payment from a shipper to a carrier by itself is insufficient evidence of a broker's acceptance of primary responsibility for unpaid transportation charges. Instead, the parties' contract and course of dealing must be examined to determine if the particular broker has agreed to assume primary liability for unpaid freight costs. *See Dampskibsselskabet Torm*, 927 F.2d at 717; *Missouri Pac.*, 720 F.2d at 819.

■ Here, the trial court examined the U.S.C./N.A.R.M. relationship and stated "it is clear from the evidence that, in their dealings, the carrier looked to the broker—and only the broker—for payment." Yet, the trial court also assumed N.A.R.M. had not agreed to accept liability for unpaid transportation charges. These contradictory conclusions show a material issue of fact exists regarding whether N.A.R.M. explicitly or implicitly agreed to become responsible for unpaid freight costs. Under these circumstances, summary judgment should not have been granted for N.A.R.M..

■ However, summary judgment was properly granted for Tucker. The parties' contract provided both parties would proceed against a shipper who failed to pay freight charges.[4] This provision indicates

---

portation broker. *See* 45 Fed.Reg. 31140, 31141 (ICC May 12, 1980).

**3.** U.S.C. also argues N.A.R.M. is liable for freight costs because N.A.R.M. untimely denied it was the shipper of the goods. As responsibility for freight charges is the ultimate issue in this case, however, N.A.R.M.'s untimely but otherwise sufficient denial of a requested admission should be accepted. *See Dahle v. Aetna Casual-*

*ty and Sur. Ins. Co.*, 352 N.W.2d 397, 402 (Minn. 1984) (untimely but otherwise sufficient admissions should be accepted if they will preserve the merits of the action and are not prejudicial).

**4.** Assuming, arguendo, that the parties' contract did not create contract carriage, then the document was a general agreement to do business between a common carrier and a broker. *See Gale v. Norwesco, Inc.*, Civil No. 4–90–156, slip

neither party expected Tucker to be liable for unpaid freight charges. Consequently, no material issue of fact regarding liability for unpaid transportation costs prevented a grant of summary judgment for Tucker.

### III.

■ Although a carrier has a duty to collect the filed rate, the filed rate may be unreasonable and therefore unenforceable. *See Maislin,* — U.S. at —, 110 S.Ct. at 2767. As the reasonableness of a filed rate is a determination which rests within the primary jurisdiction of the ICC, *see id.,* a pending undercharge case may be referred to the ICC for a rate-reasonableness hearing when sufficient evidence is produced to justify the referral. *See id.* at —— n. 10, 110 S.Ct. at 2767 n. 10; *Delta Traffic Serv., Inc. v. Appco Paper & Plastics Corp.,* 931 F.2d 5, 7 (2d Cir.1991); *Delta Traffic Serv., Inc. v. Transtop, Inc.,* 902 F.2d 101, 112 (1st Cir.1990); *Covey,* 763 F.Supp. at 482, 484; *In re Sharm Express, Inc. (Bergquist v. 7/24 Freight Sales, Inc.),* 122 B.R. 999, 1005 (D.Minn.1991) (reversing bankruptcy court).

■ Here, the trial court improperly concluded N.A.R.M. could not challenge the reasonableness of U.S.C.'s filed rate in an undercharge proceeding. A separate reparations action is no longer necessary to raise the rate-reasonableness issue. *See Maislin,* — U.S. at — n. 10, 110 S.Ct. at 2767 n. 10. (shipper may seek a rate-reasonableness determination in an undercharge case). On remand, N.A.R.M. may seek referral to the ICC if able to submit evidence sufficient to justify raising the issue of the reasonableness of U.S.C.'s filed rate.[5] *See Delta Traffic,* 902 F.2d at 106–07 (referral permitted if evidence shows a sufficient possibility ICC would find filed rates unreasonable).

op. at 7 (D.Minn. Dec. 11, 1990) (1990 Westlaw 284504). Consequently, the contract's terms still govern the parties' relationship.

**5.** Since the reasonableness of the filed rate is an ultimate issue in the case, N.A.R.M.'s untimely

### DECISION

Tucker is not liable for common carrier freight undercharges because it had a contract carriage relationship with U.S.C. Alternatively, the trial court properly granted summary judgment for Tucker because the contract shows it did not agree to be liable for unpaid freight costs. The trial court improperly granted summary judgment for N.A.R.M. because the record shows a material issue of fact exists regarding whether the broker agreed to be liable for unpaid freight costs. N.A.R.M. has not waived its rate-reasonableness defense.

Affirmed in part, reversed in part and remanded.

CRIPPEN, Judge (concurring specially).

Except on the determination that respondent Tucker Company had a contract carrier relationship with United Shipping Company, Inc., I join in the opinion of the majority. Because we determined that Tucker Company was a broker which did not agree to be liable for unpaid freight costs, my concurrence extends to all results stated by the majority.

I am not satisfied, however, that United Shipping had a contract carrier relationship with Tucker Company under 49 U.S.C. § 10102(15)(B). Even with the use of liberal standards to determine contract carrier status, it is my opinion that United Shipping and Tucker Company had a loose arrangement here which meant little to either party in the absence of additional contracts for specific carriage services.

but otherwise sufficient denial of U.S.C.'s request for an admission that its filed rates were reasonable must be accepted. *See Dahle,* 352 N.W.2d at 402.