**APL CO. PTE. LTD., Plaintiff,**

v.

**KEMIRA WATER SOLUTIONS, INC.,** (formally known as "Kemiron Companies"), **Fairyland Envitech Co. Ltd., Defendants.**

No. 11 Civ. 1686(KBF).

United States District Court, S.D. New York.

Aug. 22, 2012.

Charles S. Donovan, Brian R. Blackman, Theodore Carl Lindquist, III, Sheppard Mullin Richter & Hampton LLP, Brenna E. Moorhead, San Francisco, CA, Lisa M. Lewis, Sarah Elizabeth Aberg, Sheppard Mullin Richter & Hampton, LLP, New York, NY, for Plaintiff.

Matthew Todd Loesberg, McDermott & Radzik, LLP, Daniel Gerard McDermott, Marshall, Dennehey, Warner, Coleman & Goggin, New York, NY, Stanley Lee Gibson, Marisa Gale Huber, Gibson Robb & Lindh LLP, San Francisco, CA, for Defendants.

*MEMORANDUM & ORDER*

KATHERINE B. FORREST, District Judge:

Plaintiff APL Co. Pte. Ltd. ("APL") brings this admiralty and maritime action, pursuant to 28 U.S.C. § 1333, against defendants Kemira Water Solutions, Inc. ("Kemira") and Fairyland Envitech Co. Ltd. ("Fairyland") for breach of contract, negligence, and contribution under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601, *et seq*, related to environmental clean-up costs. This case arises from two shipments of ferrous chloride crystal ("ferrous chloride"), which leaked as a result of improper packaging at some point between their departure from Taiwan and arrival in California. APL was the carrier for the cargo of ferrous chloride, Fairyland the shipper

and Kemira the consignee. APL and Kemira made cross-motions for summary judgment as to liability on January 20, 2012.[1] For the reasons set forth below, APL and Kemira's motions are granted in part and denied in part.

BACKGROUND

The following facts are undisputed, unless otherwise noted.

On August 3, 2006, Kemira, a company that sells water treatment chemicals, and Fairyland, a Taiwanese chemical supplier, entered a Purchase Agreement, pursuant to which Kemira agreed to purchase ferrous chloride from Fairyland and Fairyland agreed to ship the chemical from Taiwan to California (the "Purchase Agreement"). (APL's Response to Kemira's Rule 56.1 Stmt. ("APL's 56.1 Response") ¶ 2; Gibson Decl. Ex. A at KWS000503.) The Purchase Agreement "confirm[ed] the product and price provisions of the sale of ferrous chloride crystal." (Gibson Decl. Ex. A at KWS000503.) Schedule A of the Purchase Agreement set forth the "General Requirements" for packaging the ferrous chloride. (*Id.* at KWS000505.)

APL is an international steamship line that in October and November 2006 shipped the two shipments of ferrous chloride. At some point along the way, the ferrous chloride leaked as a result of improper packaging, causing extensive damage to APL's ships. (Kemira's Response to APL's Rule 56.1 Stmt. ("Kemira's 56.1 Response") ¶ 3.) Ferrous chloride is a hazardous chemical classified as "Class 8: Corrosive" under the International Maritime Dangerous Goods Code, promulgated by the International Maritime Organization of the United Nations. (*Id.*)

These shipments were covered by two sea waybills—*i.e.*, non-negotiable bills of lading—that APL issued to Fairyland and which were received via fax by Kemira. (APL's 56.1 Response ¶ 3.) Among other things, the sea waybills contained the names of the shipper (Fairyland) and consignee (Kemira). (*See e.g.*, Gibson Decl. Ex. B at FTS 0021.) In the bottom right hand corner of these sea waybills, appeared the following text:

> The Shipper agrees, and the Consignee and every person purchasing this instrument for value, if negotiable, or otherwise having an interest in the Goods is advised that the receipt, custody, carriage and delivery of the Goods are subject to all the terms and conditions set forth and by [sic] incorporated by reference on this side and the reverse hereof, whether written, stamped or printed.

(*See e.g.*, *id.*) The text is miniscule and the parties dispute whether it is legible. At oral argument, however, counsel for defendant agreed that he could read it.

Regardless, there is no evidence in the record that Kemira ever received the reverse side of the sea waybills. APL asserts that the "terms and conditions" referred to on the faxed sea waybills do appear on their actual reverse sides (although they are not in the record before this Court), they are APL's "standard shipment terms," and they are available on plaintiff's website. It is APL's "standard shipment terms," which are titled "Bill of Lading Terms and Conditions," (the "Terms and Conditions") that plaintiff alleges have been breached by Kemira. Specifically, APL alleges that Kemira breached two clauses in the Terms and Conditions.

---

1. According to the docket, Fairyland does not appear to have been served with the com-    plaint.

Under the "Definitions" section, the Terms and Conditions state that a Merchant "shall be jointly and severally liable to the Carrier ... for the performance of the obligations of any of them under this Bill of Lading" (the "Merchant Clause"). (Donovan Decl. Ex. I at KWS000132.) "Merchant" is defined to include "the Shipper, Consignee, Receiver, Holder of the Bill of Lading, Owner of the cargo or Person entitled to the possession of the cargo or having a present or future interest in the Goods." (*Id.*)

In the clause entitled "Dangerous, Hazardous or Noxious Goods," the Terms and Conditions state, *inter alia:* "[w]hether or not the Merchant was aware of the nature of the Goods [which are or may become inflammable, explosive, corrosive, noxious, hazardous, dangerous or damaging] the Merchant shall indemnify the Carrier against all claims, losses, damages, liabilities or expenses arising in consequence of the Carriage of such Goods" (the "Dangerous Goods clause"). (*Id.* at KWS000139.)

## PROCEDURAL HISTORY

Prior to this case being transferred to this Court, the parties agreed that the most efficient way to proceed would be to first decide liability based on cross-motions for summary judgment and then determine what, if any, damages may be warranted. The motions were fully briefed on February 24, 2012, and the Court held oral argument on August 8, 2012.

## DISCUSSION

### I. *Summary Judgment Standard*

A court may not grant summary judgment unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In making that determination, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano,* 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed.R.Civ.P. 56(e); *see also Wright v. Goord,* 554 F.3d 255, 266 (2d Cir.2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir.2010) (citation omitted).

In addition, self-serving affidavits alone are insufficient to create a triable issue of fact. *See BellSouth Telecommc'ns, Inc. v. W.R. Grace & Co.-Conn.,* 77 F.3d 603, 615 (2d Cir.1996). Only disputes over material facts—*i.e.,* "facts that might affect the outcome of the suit under the governing law"—will preclude entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). Thus, if the evidence favoring the non-moving party is "merely colorable ... or is not significantly probative, summary judgment may

be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

## II. *Breach of Contract*

Plaintiff's breach of contract claim is premised on an assertion that Kemira is bound to the Terms and Conditions that APL argues were part of the sea waybills issued for the two shipments in question. APL argues that Kemira is bound to the Terms and Conditions under multiple theories of acceptance. Kemira asserts in its motion for summary judgment that APL cannot establish that the Terms and Conditions were ever a part of the sea waybills and, even if it could, APL cannot show that Kemira accepted them.

■ Because they are maritime contracts, federal common law controls the interpretation of the sea waybills "so long as the dispute is not 'inherently local.'" *ProShipLine, Inc. v. Aspen Infrastructures, Ltd.,* 585 F.3d 105, 110 (2d Cir.2009). The dispute here, which regards a shipment from Taiwan to California, is far from local and thus federal common law applies. As a result, this Court looks to "common law principles of contract formation and interpretation to determine whether" Kemira was bound by the sea waybills. *In re M/V Rickmers Genoa Litig.,* 622 F.Supp.2d 56, 71 (S.D.N.Y.2009) (citing *Norfolk S. Ry. Co. v. Kirby,* 543 U.S. 14, 31, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004)).

Federal courts have found "two primary methods for actually binding an intended beneficiary to a bill of lading": (1) "showing that the third party exhibited acceptance to be so bound" and (2) "through an agency relationship with one of the contracting parties." *In re M/V Rickmers Genoa Litig.,* 622 F.Supp.2d at 72.

### A. *Acceptance*

■ As a general matter, a party cannot unilaterally bind another party to a contract by capturing them within a term defined in that contract. *See In re M/V Rickmers Genoa Litig.,* 622 F.Supp.2d at 71–72. Although sea waybills or bills of lading are contracts between a shipper and a carrier, "there is ample precedent for binding a consignee" to these contracts under the theory that the non-signatory consignee accepted their terms. *Taisheng Int'l Ltd. v. Eagle Mar. Servs., Inc.,* No. Civ. A. H–05–1920, 2006 WL 846380, at *3 (S.D.Tex. Mar. 30, 2006) (collecting cases). Here, APL argues that Kemira accepted the Terms and Conditions based upon (1) its course of conduct with APL, (2) its exercise of dominion and control over the cargo and (3) its invocation of the forum selection clause contained in the Terms and Conditions.

### 1. *Course of Conduct*

Where a party does not explicitly accept the terms of a contract, its course of conduct may still evidence acceptance. Restatement (Second) of Contracts § 69(1)(c). For instance, in *Brown v. Volante Corp.,* 194 F.3d 351 (2d Cir.1999), the Second Circuit found that a defendant manifested its intent to be bound by an unsigned collective bargaining agreement where it had substantially acted under it and in accordance with its terms. *Id.* at 355–56. In the context of a maritime contract, the court in *Sea–Land Service, Inc. v. Landis,* No. Civ. A. 94–6153, 1996 WL 4120 (E.D.Pa. Jan. 3, 1996), found that a consignee defendant was bound by the terms of a bill of lading where "[f]or approximately ten years, the defendant had been using the [common carrier] to deliver goods," "all of the [common carrier's] invoice-freight bills and bills of lading contained the provision [at issue]" and "there

[was] absolutely no evidence that the plaintiff had ever contested the terms during th[e] contractual relationship." *Id.* at *3.

■ There is no material evidence in the record indicating that, as a result of Kemira's commercial relationship with APL, Kemira's silence with respect to the Terms and Conditions can be understood as acceptance. It is undisputed that prior to the shipments at issue the only shipment that Kemira had with APL was a trial shipment of ferrous chloride in 2005. (APL's 56.1 Response ¶ 12.) There is therefore little past dealing from which this Court could infer that Kemira's silence as to the two sea waybills at issue was equivalent to acceptance of the Terms and Conditions—on these facts, this Court declines to find that one prior interaction could constitute a "course of dealing" sufficient to this task, *cf. One Beacon Insu. Co. v. Crowley Marine Services, Inc.*, 648 F.3d 258, 266 (5th Cir.2011) ("[C]ourts have found a course of dealing between parties to a maritime contract based on a party's receipt of as few as three or four bills of lading containing the same limitation of liability terms."). Even if one prior interaction was sufficient, however, there is no evidence in the record that Kemira accepted the terms and conditions of the sea waybill it received for the 2005 trial shipment. Thus, there is no prior conduct by Kemira that supports a finding that it accepted the Terms and Conditions that APL alleges it breached.

### 2. *Exercise of Dominion and Control Over the Cargo*

■ APL next argues that Kemira is bound to the Terms and Conditions because Kemira exercised "dominion and control" over the cargo. In support of its argument, APL cites to *A/S Dampskibsselskabet Torm v. Beaumont Oil Ltd.*, 927 F.2d 713 (2d Cir.1991) ("*Beaumont Oil*").

In *Beaumont Oil*, a carrier brought suit against a consignee seeking recovery of freight charges. Finding that the bill of lading was silent as to which party was liable for freight charges, the Second Circuit turned to whether the consignee impliedly agreed to pay freight charges under the theory of "presumptive ownership"— *i.e.*, where a party exercises dominion and control over cargo it presumptively owns it and is consequently liable for freight charges. *Id.* (citing *States Marine Int'l, Inc. v. Seattle–First Nat'l Bank*, 524 F.2d 245, 247 (9th Cir.1975)).

*Beaumont Oil* does not support the proposition that a bill of lading or sea waybill is binding on a consignee when it exercises dominion and control over cargo. Rather, the case relates to an implied obligation to pay freight charges separate and apart from an operative bill of lading; critically, in *Beaumont Oil*, the bill of lading at issue was silent as to which party was obligated to pay freight charges. *Id.* It does not appear that any court has extended the *Beaumont Oil* decision in the way APL contends it should be applied here and this Court declines to extend it now.

■ However, even if the Court were to extend *Beaumont Oil* outside the context of freight charges—*i.e.*, if exercising dominion and control over cargo could bind a consignee to the bill of lading or sea waybill upon which that cargo was issued— Kemira would still not be bound to the Terms and Conditions. As the Second Circuit has instructed, "[t]he critical inquiry ... is whether the actions undisputedly taken ... were sufficient to confer ... the status of a presumptive owner." *Id.* at 719. APL here points to the fact that Kemira "claim[ed] the goods as importer and arrang[ed] for their clearance through customs." (APL Mem. 9, Jan. 20, 2012 (Dkt. No. 73).)

That action cannot be considered undisputable. The sea waybills explicitly stated that this was a Delivered Duty Paid ("DDP") transaction—meaning, the seller (Fairyland) bore the risks and costs associated with delivering the ferrous chloride until it was delivered to Kemira. (*See* Gibson Decl. Ex. B at FTS 0022, FTS 0054.) Kemira rejected these two shipments, stating in a letter to Fairyland, dated November 3, 2006, that "the two most recent shipments are materially nonconforming deliveries which substantially impair the value of the goods." (Donovan Decl. Ex. I at KWS000071.) It can thus not be said that "the actions *undisputedly* taken" conferred presumptive ownership. *Beaumont Oil*, at 719 (emphasis added).

Accordingly, even if *Beaumont Oil* could be extended to encompass this case (and this Court declines to do so here), Kemira would not be bound to the Terms and Conditions.

### 3. *Invocation of the Forum Selection Clause*

■ APL argues that another action taken by Kemira binds it to the Terms and Conditions: Kemira's invocation of the forum selection clause contained within the Terms and Conditions. Prior to this matter being transferred here by Judge Conti of the Northern District of California, Kemira brought a motion to dismiss "on the grounds of improper venue based on a forum-selection clause contained in the contracts upon which Plaintiff brings this complaint." (Notice 1, Dec. 3, 2009 (Dkt. No. 17).) By invoking the forum selection clause, APL claims that Kemira "ratified" the Terms and Conditions. However, Judge Conti rejected plaintiff's argument when deciding that motion and this Court now agrees with his reasoning.

With regard to Kemira's earlier motion to dismiss, APL claimed that Kemira was attempting to "have its cake and eat it too"—*i.e.*, it was contradictory, APL argued, for Kemira to maintain that the Terms and Conditions did not apply to it but at the same time invoke a right granted under the Terms and Conditions. (Order 4–5, Mar. 10, 2010, 2010 WL 841285 (Dkt. No. 25).) In response to this argument, Judge Conti decided that "[b]ecause APL is alleging that Kemira is a Merchant, Kemira and [the district court] may rely on this allegation to conclude that Kemira has standing to 'refer' this dispute to the Southern District of New York." (*Id.* at 5.) Citing *Marra v. Papandreou*, 216 F.3d 1119 (D.C.Cir.2000), Judge Conti explained that "a forum-selection provision is separate from the obligations the parties owe to each other under the remainder of the contract" and that "when a court determines that a forum-selection clause is enforceable, it is not making an assumption of law-declaring power vis-à-vis other provisions of the contract." (*Id.*) The Court considered that Kemira would ultimately argue "that it was not even a party to the Bills of Lading," but left it for this Court to decide that issue. (*Id.*)

In support of its contention that the invocation of the forum selection clause ratified the Terms and Conditions, plaintiff cites to two cases in this District that stand for the noncontroversial rule that when a party files a suit under a bill of lading, it accepts its terms. (APL Mem. 9, Jan. 20, 2012 (citing *Farrell Lines Inc. v. Columbus Cello–Poly Corp.*, 32 F.Supp.2d 118, 125 (S.D.N.Y.1997)) and *Russul Corp. v. Zim Am. Integrated Shipping Servs. Co.*, 2009 A.M.C. 546, 2009 WL 3247141, at *3, 2009 U.S. Dist. LEXIS 91098, at *9 (S.D.N.Y.2009).) These cases, however, are inapposite here because Kemira did not file the instant lawsuit.

This Court agrees with Judge Conti's earlier decision in this matter. Kemira's referral to the forum selection clause was

not acceptance of the Terms and Conditions.

### B. *Agency*

■■■ This Court's decision that Kemira did not accept the Terms and Conditions does not end the inquiry regarding whether the Terms are Conditions are binding on Kemira. In addition to the acceptance theory, a carrier may also be bound to a bill of lading by the shipper (here, defendant Fairyland) by principles of agency. "Federal maritime common law embraces principles of agency" and "courts in this Circuit have looked to the Restatement (Second) of Agency (1958)." *In re M/V Rickmers Genoa Litig.*, 622 F.Supp.2d at 74; *see also Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 329 (S.D.N.Y.2009) (citing *Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329, 339–40 (2d Cir.1986)).

■■■ "A basic principle of agency law is that an agency relationship exists only if the agent is acting on behalf of and subject to the control of the principal." *Neewra*, 687 F.Supp.2d at 329 (citing Restatement (Second) of Agency §§ 14–15). "Authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *In re M/V Rickmers Genoa Litig.*, 622 F.Supp.2d at 74 (citing Restatement (Second) of Agency § 26).

In support of its argument that Fairyland bound Kemira to the Terms and Conditions as its agent, APL points to the Purchase Agreement between Kemira and Fairyland. Yet, there is nothing in the Purchase Agreement that indicates Fairyland was acting on behalf of Kemira and under Kemira's control when it entered into the sea waybills with APL. While it is true that the Purchase Agreement dictated certain contractual obligations that Fairyland was to perform related to the shipment of ferrous chloride, that in and of itself does not establish an agency relationship vis-à-vis the sea waybills. *See e.g., Prof'l Commc'ns, Inc. v. Contract Freighters, Inc.*, 171 F.Supp.2d 546, 551 (D.Md. 2001) ("A mere contract to ship goods does not establish an agency relationship."); *Acme Delivery Serv., Inc. v. United States*, 817 F.Supp. 889, 893 (D.Colo.1993) (same).

At base, there is no material fact in the record indicating that Fairyland was acting on behalf of and under the control of Kemira when it entered into the sea waybills. Fairyland thus could not have bound Kemira to the sea waybills under an agency theory.

Accordingly, APL's motion for summary judgment as to its breach of contract claim is denied and Kemira's motion for summary judgment as to the breach of contract claim is granted.[2]

### III. *CERCLA*

■■■ APL next brings a claim under CERCLA for contribution related to the costs associated with cleaning up the ferrous chloride. CERCLA permits owners of polluted property to seek reimbursement for clean-up costs from another so-called potentially responsible party ("PRP"). The statute "requires a plaintiff to establish: (1) defendant fits one of the four classes of responsible parties outlined in § 9607(a); (2) the site is a facility; (3) there is a release or threatened release of

---

2. Because this Court finds that Kemira did not accept the Terms and Conditions and that Fairyland did not bind Kemira to them as its agent, the Court need not reach Kemira's argument that APL cannot show in the first instance that the Terms and Conditions were in fact incorporated into the sea waybills.

hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the National Contingency Plan set up under the Act and administered by the EPA in order to prioritize hazardous substance release sites throughout the nation." *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1198 (2d Cir.1992).

The parties here dispute whether the bags containing the ferrous chloride are "facilities" and whether Kemira is a PRP.

### A. *Facility*

A "facility" under CERCLA is defined, in relevant part, as "any ... storage container." 42 U.S.C. § 9601(9)(A). The "bulk bags" used to hold the ferrous chloride are storage containers. *Cf. United States v. M/V Santa Clara I,* 887 F.Supp. 825, 844 (D.S.C.1995) (summarily finding that drums containing magnesium chloride on a vessel to be "storage containers" under CERCLA). Even if there were ambiguities, this Court is to "construe the statute liberally" in light of CERCLA's "expansive, remedial purpose." *Schiavone v. Pearce,* 79 F.3d 248, 253 (2d Cir.1996). Thus, this Court concludes that the bulk bags at issue here fall under the statute.

### B. *Potentially Responsible Party*

APL contends that Kemira was an operator under Section 9607(a)(2) of CERCLA, and thus a PRP, because the Purchase Agreement between Kemira and Fairyland dictated the way in which the ferrous chloride was to be packaged, (*see* Gibson Decl. Ex. A at KWS000505). Kemira argues that, pursuant to Section 9601(20)(B), it cannot be found liable under CERCLA because the leak of ferrous chloride was due to factors beyond its control.

Under Section 9607(a)(2), a responsible party is "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). In order to be an operator under CERCLA, a person "must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *United States v. Bestfoods,* 524 U.S. 51, 65–66, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998).

It is not disputed that Kemira dictated to Fairyland the way in which the ferrous chloride was to be packaged and that its instructions related specifically to "leakage." Schedule A of the Purchase Agreement directed Fairyland that the ferrous chloride shall:

1. Be shipped in bottom unloading 1 metric ton net weight bulk bags with four loops capable of suspending the entire bag.

2. The bulk bags will be shipped in such a manner to assure that all material arrives at destination with sacks intact and without material leakage.

3. The bulk bags shall be impermeable to water.

4. The bulk bags shall be loaded into the container such that they will be able to be unloaded via forklift trucks or via pallet jacks of U.S. specifications.

5. Material quality will be consistent throughout the shipment and within the bulk bags with respect to stated specifications.

6. Quantities of material in the bulk bags will be consistent throughout the shipment and within the bulk bags with respect to stated specifications.

. . . .

(*See* Gibson Decl. Ex. A at KWS000505.) Kemira argues, at least in part, that it is not an operator because Fairyland "carried out the packaging." (Kemira Mem. 21, Jan. 20, 2012 (Dkt. No. 68).) Accordingly, Kemira contends, any "negligent packing or stowing is [ ] not attributable to" Kemira. (*Id.*)

■ Kemira's argument is misplaced at this stage of the litigation. As the Second Circuit has held:

> Defenses of minimal involvement or limited proof of responsibility do have a role in the CERCLA scheme; they come in to play during the damages phase when the court is charged with equitably apportioning the costs of the cleanup among the PRPs.

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.,* 596 F.3d 112, 132 (2d Cir. 2010). Thus, the extent to which Kemira was at fault and the amount of contribution Kemira owes to APL may be limited or it may not—that is a determination for a later time.

Kemira, however, argues that, according to Section 9601(20)(B), it cannot be found liable for contribution to APL for clean-up costs. Section 9601(20)(B) states that:

> In the case of a hazardous substance which has been accepted for transportation by a common or contract carrier and except as provided in section 9607(a)(3) or (4) of this title, (i) the term "owner or operator" shall mean such common carrier or other bona fide for hire carrier acting as an independent contractor during such transportation, (ii) the shipper of such hazardous substance shall not be considered to have caused or contributed to any release during such transportation which resulted solely from circumstances or conditions beyond his control.

42 U.S.C. § 9601(20)(B).

Kemira argues that it is a "shipper" for purposes of CERCLA and that any release of ferrous chloride was wholly outside of its control because Fairyland packaged the chemical—thus, Kemira claims, it cannot be held responsible for any clean-up costs. (Kemira Mem. 21, Jan. 20, 2012 (citing *United States v. M/V Santa Clara I,* 887 F.Supp. 825, 841 (D.S.C.1995)).) There are two issues with Kemira's argument.

■ First, there can be only one "shipper" for purposes of CERCLA and here the shipper is Fairyland. The District of South Carolina court in *Santa Clara I,* following a review of the legislative history of CERCLA and the term "shipper," found that "the shipper can be either the seller ... or the purchaser." *M/V Santa Clara I,* 887 F.Supp. at 841. Although it did not explicitly so hold, the *Santa Clara I* court's interpretation of the statute presupposed that only one party could be the shipper. *Id.* at 844 ("[T]his court must also determine the identity of the CERCLA 'shipper.'"). That interpretation is consistent with the plain language of the statute, which speaks in terms of a single shipper.

■ Here, unlike in *Santa Clara I,* there is no dispute regarding who the shipper was—it was Fairyland. *Id.* at 842 ("[T]here is a dispute as to which party was the shipper ... under the terms of the sales contract.") The Purchase Agreement clearly contemplates Fairyland as the shipper of the ferrous chloride and the sea waybills list Fairyland as the shipper. Accordingly, only Fairyland could take advantage of Section 9601(20)(B), if the cause of the leak was due to circumstances or conditions beyond its control.

Section 9601(20)(B) would also not divest Kemira of liability at this stage for a second, alternative reason. Assuming that Kemira was the "shipper" under this section, there is not enough evidence in the record to conclude that the release of fer-

rous chloride resulted "*solely* from circumstances or conditions beyond [Kemira's] control." 42 U.S.C. § 9601(20)(B) (emphasis added). For instance, there would be a material dispute of fact with regard to whether the specifications of the bulk bags that Kemira directed Fairyland to use were appropriate. As a result, whether Section 9601(20)(B) does or does not apply to Kemira does not have a practical impact on this proceeding—either way the parties would proceed to discovery regarding the extent to which Kemira is culpable for a portion of damages.

Having found that there is no material dispute of fact that the bulk bags holding the ferrous chloride are facilities and Kemira is a potentially responsible party, APL's motion for summary judgment as to its CERCLA claim is granted and Kemira's motion for summary judgment as to the CERCLA claim is denied.[3]

## IV. *Negligence*

The theory upon which APL basis its final claim—for negligence—is murky. APL's complaint appears to make a failure to warn or general negligence claim, however APL's asserts a negligence *per se* claim in its briefing on this motion. Nonetheless, based upon the undisputed facts, this Court concludes that Kemira did not owe a duty to APL, a requirement under any negligence theory. *See e.g., In re M/V Rickmers Genoa Litig.*, 622 F.Supp.2d at 64 (dismissing claims for general negligence and failure to warn where consignee had no duty to vessel owner); *Gray ex rel. Rudd v. Beverly Enters.-Mississippi, Inc.*, 390 F.3d 400, 407 (5th Cir.2004) ("Negligence *per se* . . . is a theory by which statutes are used to establish the appropri-

ate standard of care. In absence of a duty to the plaintiff, the relevant standard of care is moot.")

Under federal maritime common law, a purchaser of goods does not typically owe the carrier of those goods general duties of care or a duty to warn of risks associated with cargo. *See In re M/V Rickmers Genoa Litig.*, 622 F.Supp.2d at 64–65 (gathering cases where "courts sitting in common law have tended to reject buyer liability theories"). *See also Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1076–77 (2d Cir.1993). The court in *Rickmers Genoa* pointed out, however, that "[s]ome cases have intimated that a buyer's duty might lie if the buyer had unique knowledge or control over its purchased cargo." *In re M/V Rickmers Genoa Litig.*, 622 F.Supp.2d at 65 (citing *Aslanidis*, 7 F.3d at 1077; *DiGregorio v. N.V. Stoomvaart Maatschappij "Nederland"*, 411 F.Supp. 331, 335 (S.D.N.Y. 1975), 411 F.Supp. at 335.). It is not clear that a court has in fact ever applied this exception to the general rule, but even if it were the law it would not be applicable here.

It is undisputed that Kemira and APL had access to the same relevant information—*i.e.*, that the material being shipped was ferrous chloride. (*See* Gibson Decl. Ex. B at FTS 0001 (identifying the cargo as "FERROUS CHORIDE [sic] CRYSTAL" on the sea waybills).) APL has not asserted that Kemira had any sort of special knowledge regarding the properties of the ferrous chloride and "general knowledge about the characteristics" of hazardous cargo alone is not enough to create a duty. *M/V Rickmers Genoa Litig.*, 622 F.Supp.2d at 66.

---

**3.** The Court notes that APL did not address the CERCLA claim in its memorandum submitted in support of its motion for summary judgment on liability. However, APL did move with respect to liability on all of its claims and addressed the CERCLA claim at oral argument and in its opposition to Kemira's motion for summary judgment.

In addition, the packaging specifications set forth in the Purchase Agreement did not establish a duty owed by Kemira to APL. The specifications were not in any way unique to this transaction, such that Kemira can be said to have had "control" over the cargo. Kemira did not, for instance, package, manufacture or stow the cargo; indeed, the Purchase Agreement gave Fairyland the leeway to package the ferrous chloride "in such a manner to assure that all material arrives at destination … without material leakage." (*See* Gibson Decl. Ex. A at KWS000505.) If this Court were to find that Kemira owed a duty to APL under these circumstances, buyer liability hinted at in other cases would become the rule rather than the exception.[4]

Because this Court does not find that Kemira owed APL a duty, APL's motion for summary judgment as to its negligence claim is denied and Kemira's motion for summary judgment as to the negligence claim is granted.

## V. *Objections to Evidence*

Finally, Kemira has objected to APL's use of certain pieces of evidence as inadmissible. This Court has reviewed the declarations, reports and exhibits that Kemira asserts are inadmissible and finds that, even if it were to take this evidence into account, it would have no bearing on the Court's conclusions either way. Accordingly, Kemira's objections are denied as moot.

## CONCLUSION

For the reasons set forth above, APL and Kemira's motions for summary judgment are granted in part and denied in part. As to the breach of contract and negligence claims, Kemira's motion for summary judgment is GRANTED, and APL's is DENIED, and these claims are dismissed. As to the CERCLA claim, APL's motion is GRANTED, and Kemira's is DENIED, and this claim survives.

The parties are directed to submit a joint schedule for the remainder of this action not later than September 7, 2012.

The Clerk of the Court is directed to terminate the motions at Docket Nos. 67 and 72.

SO ORDERED.

---

**4.** This Court's finding that Kemira is an operator under CERCLA, but did not have "unique knowledge or control" of the packaging of the ferrous chloride for purposes of the negligence inquiry, is, with respect to this case in particular, consistent with the Second Circuit's directive to "liberally construe CERCLA in order to accomplish [its] congressional objectives." *Niagara Mohawk Power*

*Corp. v. Chevron U.S.A., Inc.,* 596 F.3d 112, 132 (2d Cir.2010). Due to CERCLA's "unique[ ]" "legislative scheme," which has an "expansive remedial purpose," "CERCLA liability is often broader than these traditional purposes would justify." *See Schiavone v. Pearce,* 79 F.3d at 253–54 (comparing "common law principles of corporate insulation" to CERCLA liability).