**STATES MARINE INTERNATIONAL, INC., Plaintiff-Appellant,**

v.

**SEATTLE–FIRST NATIONAL BANK, Defendant-Appellee.**

No. 74–2010.

United States Court of Appeals, Ninth Circuit.

Oct. 16, 1975.

---

David M. Salentine (argued), Bogle, Gates, Dobrin, Wakefield & Long, Seattle, Wash., for plaintiff-appellant.

Douglas W. McQuaid (argued), Aiken, St. Louis & Siljeg, Seattle, Wash., for defendant-appellee.

## OPINION

Before CHAMBERS and KENNEDY, Circuit Judges, and JAMESON,* District Judge.

JAMESON, District Judge:

This is a suit in admiralty seeking recovery of shipping charges. The carrier, States Marine International, Inc. (States Marine) brought suit against the shipper, Royal Red Seafoods, Inc. (Royal), its president, Harold Daubenspeck, and Seattle-First National Bank. The freight charges resulted from two shipments of canned salmon from Bristol Bay, Alaska, to Seattle and Bellingham, Washington, on vessels operated by States Marine. The Bank held a security interest in the salmon and was named as consignee by Royal. A counterclaim for damages to the cargo was asserted by the defendants. Following a nonjury trial the district court entered a judgment for $30,960, the amount of the charges, in favor of States Marine and against Royal and denied recovery against the Bank. The action was dismissed as to Daubenspeck, as was the counterclaim for damages. This appeal is limited to that portion of the judgment denying recovery against the Bank.

Royal entered into a security agreement and general pledge with the Bank in May, 1970, to finance its canning operations for the 1970 fishing season. Under this agreement the Bank acquired a security interest in all of Royal's property, including canned salmon. Financing statements were filed in Washington and Alaska. The Bank commenced making loans to Royal on July 8, 1970, and during 1970 Royal borrowed in excess of $700,000.[1]

On July 26, 1970 States Marine accepted a cargo of canned salmon from Royal for shipment to Seattle. A straight bill of lading was prepared by an employee of Royal on a form supplied by States Marine. Following the printed words "Consigned to", there was inserted, "Seattle First National Bank c/o Royal Red Seafoods, Inc. 1455 No. Northlake Place, Seattle, Washington 98103". The second shipment for delivery at Bellingham was accepted on July 28, 1970. The consignee was designated as "Seattle First National Bank—account of Royal Red Seafoods, Inc.", followed by the same address in Seattle. Both shipments were to be delivered to warehouses at the respective ports. Each bill had a space after the heading "Address Arrival Notice to" filled in as follows: "Royal Red Seafoods, Inc.," followed by Royal's Seattle address.

The canned salmon was delivered by States Marine to the destinations in Bellingham and Seattle. As provided in the bills of lading, arrival notices were sent to Royal notifying it that its goods had been delivered and were being held in the warehouses. Pursuant to the lending agreement between the Bank and Royal, negotiable warehouse receipts were issued by the warehouses to the Bank for the loan account of Royal. The salmon remained in the warehouses until Royal was able to conclude sales agreements with its customers, at which time Royal notified the Bank of the sales, and the Bank then instructed the warehouses to release the goods for sale through documents known as Banker's

---

* Honorable W. J. Jameson, United States Senior District Judge for the District of Montana, sitting by designation.

1. The loan was repaid in full by August 24, 1972 from proceeds of the sale of goods involved in the action. (From Stipulated Facts)

Orders. The proceeds from the sales of the salmon were forwarded to the Bank under a trust receipt arrangement.

The bills for the shipping charges were sent by States Marine to Royal and not to the Bank.[2] When Royal failed to make payment, this action was filed under 28 U.S.C. § 1333. Most of the facts were stipulated in a pretrial order. Following the submission of the evidence, exhibits, and oral argument, the district judge stated that he was not satisfied that "the bank incurred any liability" for freight charges, that he did not believe that "there was a delivery within the meaning of the rule" (which holds certain consignees responsible for freight charges); and "while shipper named the bank as consignee, the bank had no knowledge it had been so named".

At the court's request findings of fact and conclusions of law were prepared by counsel and signed by the judge. The findings of fact included:

"IX.

Negotiable warehouse receipts were issued by warehouses in Seattle and Bellingham to Bank indicating receipt of the cargo shipped on the Vessels CONSTITUTION STATE and STEEL EXECUTIVE for the account of 'Seattle-First National Bank Acct. Royal Red Seafoods, Inc.' Said Documents do not contain any obligation of Bank to pay any freight charges and Bank did not author, direct or prepare the phraseology, verbage or content thereof."

"XII.

Bank did not at any time material exercise any control over the movement of the goods from Alaska to Washington, nor did Bank authorize Royal or any other person to designate Bank as consignee; nor did Bank authorize Royal to obligate Bank to pay any indebtedness of Royal. The inclusion of Bank as a named party to the bills of lading was a voluntary act of Royal and was inserted without the permission of Bank. Bank did not receive copies of the bills of lading and had no knowledge of the fact that Royal had inserted Bank as a named party on the bills of lading."

"XIII.

Bank did not accept shipment of the goods."

The conclusions of law stated, *inter alia:*

"II.

Bank did not contract with States for the shipment of the goods in question or appoint Royal as Bank's agent.

"III.

There was not delivery of the goods to Bank and it did not accept shipment of the goods."

Appellant contends that as the consignee named in the bill of lading, the Bank is liable for the freight charges since it (1) accepted delivery of the goods through the warehouses and (2) "exercised such exclusive dominion and control from the moment of delivery that it constituted itself the 'presumptive owner' of the goods."

■ It is well settled that the shipper rather than the consignee is primarily liable to the carrier for freight charges *Louisville & N. R. Co. v. Central Iron & Coal Co.,* 265 U.S. 59, 67, 44 S.Ct. 441, 68 L.Ed. 900 (1924). It is only when there is some binding obligation on the part of the consignee to pay freight charges that the courts will look beyond the shipper's primary responsibility.

Most commonly the consignee's obligation to pay freight charges arises under the Interstate Commerce Act, 49 U.S.C. § 3. The Shipping Act, 46 U.S.C. § 817, under which an ocean shipper's tariffs

---

**2.** A vice president of the Bank testified that the Bank did not ever receive from States Marine any freight bill or invoice or demand to pay freight bills. Nor was the bill of lading or a counterpart of the original ever delivered to the bank.

are filed, does not contain similar provisions with respect to a consignee's liability. The consignee's responsibility for shipping charges, however, may be based on a contractual obligation as well as upon a statutory requirement. In the absence of express statutory provisions regarding a consignee's liability for ocean shipments, it is necessary to determine whether, under the applicable law, there may be an enforceable contractual obligation.[3]

To determine the existence of a consignee's contractual liability, the courts examine first the bill of lading which "serves both as a receipt and as a contract." *Louisville & N. R. Co.,* 265 U.S. at 67, 44 S.Ct. at 443. Where, as here, the bills of lading impose no liability the courts must look beyond the express contract to the conduct of the consignee to ascertain whether a promise by him to pay the freight charges may be implied. In establishing such an implied obligation, several indicia have been relied upon.

■ The most obvious indication of a consignee's implied agreement to pay for freight charges occurs when he accepts the goods himself, indicating that they are his own and not the shipper's. The Supreme Court has said, "The weight of authority seems to be that the consignee is *prima facie* liable for the payment of the freight charges when he accepts the goods from the carrier." *Pittsburgh C. C. & St. Louis R. R. v. Fink,* 250 U.S. 577, 581, 40 S.Ct. 27, 63 L.Ed. 1151 (1919). Even where there is no actual acceptance of the goods by the named consignee, presumptive ownership may arise from his exercise of dominion and control over the shipment. Thus, it has

been held that if the consignee reconsigns the goods or changes the shipper's instructions, an implied acceptance of the goods may result, and the inference may then arise that the consignee has assumed liability for the freight charges. *See, e. g., New York Central R. Co. v. Warren Ross Lumber Co.,* 234 N.Y. 261, 137 N.E. 324, 325 (1922); *Union Pacific R. Co. v. American Smelting & Refining Co.,* 202 F. 720, 723 (8 Cir. 1912); *New York Cent. R. Co. v. Transamerican Petroleum Corp.,* 108 F.2d 994, 999 (7 Cir. 1939).[4]

The rules with respect to the liability of a consignee for freight charges were well summarized by the Arizona Court of Appeals in *Arizona Feeds v. Southern Pacific Transp. Co.,* 21 Ariz.App. 346, 353, 519 P.2d 199, 206 (1974). Recognizing that a consignee may be liable for freight charges by virtue of either an express or implied contract, the court continued:

"The mere designation in the bill of lading of the consignee as the one liable for the freight charges does not create a contractual relationship between the carrier and the consignee, rendering the latter liable therefor, but rather, the consignee becomes liable therefor when an obligation arises on his part from presumptive ownership, acceptance of goods and the services rendered, and the benefits conferred by the carrier for such charges."

■ We are not persuaded that appellant has established either acceptance of the goods by the Bank or that the Bank otherwise exercised the dominion or control necessary to imply a contractual obligation to pay the freight charges. It is

---

3. Virtually all of the cases on a consignee's liability for freight charges involve railroads operating under the Commerce Act and tariffs filed thereunder. Since the rules established in those cases depend on both the common law and statutory authority derived from common law, the rules established in the railroad cases may properly be applied to oceans shippers operating under tariffs filed pursuant to the Shipping Act.

4. Both *Warren Ross* and *Transamerican Petroleum Corp.,* however, recognize that a reconsignment by a consignee does not necessarily result in an acceptance of goods and the fixing of liability for shipping charges. This depends upon the circumstances of the particular case.

undisputed that the Bank had no knowledge that it was named by Royal as consignee in the bills of lading. It did not receive copies of the bills. Royal's unilateral act could not in itself impose liability on the Bank. Nor does any subsequent act of the Bank imply acceptance or control sufficient to impose liability.

Appellant argues that the Bank "accepted the two shipments in question by accepting the warehouse receipts from the warehouses after delivery of the merchandise". Following the language of the bills of lading, the warehouse receipts acknowledged receipt of the goods for the account of "SEATTLE–FIRST NATIONAL BANK, Account: Royal Red Seafoods, Inc., 1455 N. Northlake Place, Seattle, Washington 98103".[5] It is true that this indicates that the goods were received and stored for the Bank's account, but it also shows that the goods were held for Royal's account with the Bank—more indicative of a security interest than ownership in the Bank. Moreover, as the district court found, the receipts did not contain any obligation to pay freight charges.

There was no prior agreement between the Bank and the warehouses that they would accept the goods for the Bank; nor did the Bank know about the deliveries when they were made. When the goods arrived, notices were sent to Royal pursuant to instructions in the bills of lading, and no notice was sent to the Bank. Thereafter, the Bank was treated and acted at all times as a secured creditor, following standard commercial practices, and not as an owner of the goods.

The Banker's Orders authorizing the warehouse to release the salmon as Royal sold it were standard devices in warehouse receipt financing. Since the goods were subject to the Bank's security interest, they could not be sold without the Bank releasing that interest. There is no evidence that the Bank engaged in any of the selling operations or participated in any profits from the sales. The benefits received by the Bank from the salmon sales were as a creditor receiving interest on its loans.[6] Nor is there evidence that appellant was misled by any act of the Bank. It is significant also that appellant sent its bills for the shipping charges to Royal and not to the Bank.

Under these circumstances the district court was correct in finding that the warehouse did not accept delivery of the goods from the carrier on behalf of the Bank. Nor is there evidence of acts of dominion or control by the Bank sufficient to create a presumptive ownership and implied obligation to pay the shipping charges.

Affirmed.

---

**5.** As the district court noted during argument of counsel, apparently a form was used which was designed for a consignor-consignee relationship, but the Bank was not responsible for the phraseology or use of the form.

**6.** Nor do we find any merit in appellant's contention that by asserting a counterclaim the Bank indicated its status as owner. Royal and Daubenspeck amended their answer to assert the counterclaim for damages. Subsequently the answer was amended again to include the Bank as a party to the counterclaim. Rule 8(e), F.R.Civ.P., expressly authorizes inconsistent claims or defenses.