**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MILOS PRODUCT TANKER
CORPORATION,

          *Plaintiff-Appellee*,

  v.

VALERO MARKETING AND
SUPPLY COMPANY,

          *Defendant-Appellant*,

 and

DOES, 1 to 10,

          *Defendant*.

No.23-55655

D.C. No.
2:22-cv-01545-
CAS-E

OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted May 16, 2024
Pasadena, California

Filed September 18, 2024

Before:  N. Randy Smith and Salvador Mendoza, Jr.,
Circuit Judges, and John Charles Hinderaker,[*] District
Judge.

Opinion by Judge Hinderaker

**SUMMARY**[**]

**Maritime Law**

The panel reversed the district court's summary judgment in favor of Milos Product Tanker Corp. and remanded in Milos's action against Valero Marketing and Supply Co. for breach of a contract for the transportation by sea of jet fuel belonging to Valero.

Milos entered into a maritime transportation contract, or charter party, with GP Global PTE Ltd. on behalf of Gulf Petrochem FCZ, which arranged for the voyage. As authorized by the charter party, Milos's ship captain signed bills of lading for the cargo, listing Valero as the party to notify when the shipment arrived. The original bills of lading were unavailable at the discharge port, and Milos released the jet fuel to Valero under a letter of indemnity from GP Global. Valero paid freight costs when it bought the fuel from Koch Refining International PTE Ltd., Co., and Valero refused also to pay Milos. The district court concluded that

[*] The Honorable John Charles Hinderaker, United States District Judge for the District of Arizona, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Valero breached an express or implied contract to pay Milos for transportation.

The panel held that under maritime law, the party that sends goods, the shipper or consignor, is primarily liable to the carrier for freight charges, even when a bill of lading purports to impose liability on the receiver of the goods, or consignee. However, a contract may form binding obligations that modify this general rule. If a contract allocates freight liability to a nonparty, then the court must determine whether the nonparty consented to be bound under the contract. If no contract allocates freight liability, courts may still find an implied promise to pay in some circumstances. When a statute or default rules imply a consignee's promise to pay freight upon acceptance, courts may also have to consider whether a party acted as the consignee or whether the consignee accepted the goods. Adopting a narrow reading of *States Marine Int'l, Inc. v. Seattle-first Nat'l Bank*, 524 F.2d 245 (9th Cir. 1975), the panel held that *States Marine* applied rules established in railroad cases to ocean carriers only to the extent that both are common carriers. Thus, any implied obligation for private-carrier consignees such as Valero to pay freight must fit with foundational contract principles.

The panel held that there existed between Milos and Valero no express contract that might rebut the presumption that the shipper, GP Global, must pay freight. Rather, the charter party between Milos and GP Global specifically stated that GP Global would pay freight.

The panel further held that Valero's conduct as the consignee in accepting the fuel was insufficient to imply its agreement to be bound by the bills of lading and to pay freight. In addition, no obligation to pay could be implied to

Valero, and Milos could not recover in equity because Valero, which paid cost and freight charges to Koch, was not unjustly enriched.

## COUNSEL

Conte C. Cicala (argued), Withers Bergman LLP, San Francisco, California; Thomas M. Fedeli, Clyde & CO US LLP, Los Angeles, California; for Plaintiff-Appellee.

Keith B. Letourneau (argued) and Zachary R. Cain, Blank Rome LLP, Houston, Texas, for Defendant-Appellant.

## OPINION

HINDERAKER, District Judge:

Defendant–Appellant Valero Marketing and Supply Company ("Valero") appeals the district court's grant of summary judgment for Plaintiff–Appellee Milos Product Tanker Corporation ("Milos"). In 2020, Milos transported by sea roughly 40,000 tons of jet fuel belonging to Valero. This transport cost a little over $1,000,000. But after Milos delivered, Valero refused to pay. Valero had already paid freight costs when it bought the fuel from a third company, Koch Refining International PTE Ltd., Co. ("Koch"), and had no intention of paying twice. Koch was also unwilling to pay Milos. Milos's contract was with a fourth company, GP Global PTE Ltd. on behalf of Gulf Petrochem FCZ ("GP Global"), which arranged the voyage. But GP Global had

"experienced financial difficulties" and could not pay. So Milos sued Valero for, relevant here, breach of contract.

The district court found for Milos, determining that Valero breached an express or implied contract to pay Milos for transportation. The court reasoned that Valero's conduct showed its consent to be bound by the contract between Milos and GP Global. That contract, according to the district court, gave Milos the authority to look to a nonparty for payment. The district court also concluded that Valero was alternatively liable under *States Marine International, Inc. v. Seattle-First National Bank*, 524 F.2d 245, 248 (9th Cir. 1975), finding an implied obligation to pay transportation costs based on Valero's receipt of the fuel.

Reviewing de novo, we agree with Valero. Valero was not party to the contract between Milos and GP Global. That contract specifically stated that GP Global would pay freight. Why Valero's payment for freight to Koch never made it to Milos through GP Global is beyond the scope of this case. And *States Marine* does not support an implied obligation for Valero to pay. *States Marine* modestly extended freight rules established in railroad cases to ocean carriers "operating under tariffs"—that is, from railroad common carriers to ocean common carriers. In both railroad and ocean contexts, common carriers must publish their rates and are subject to default terms of a universal bill of lading. These distinctions permit a presumption that whoever accepts delivery of a shipment from a common carrier understands what they are liable to pay. But in a private-carriage case like this one, notice of shipping costs and default terms cannot be presumed. It was therefore error to find that Valero had an implied obligation to pay under *States Marine*, and we must reverse.

# I.

The following facts are stipulated or undisputed.

## The Charter Party Contract (GP Global and Milos)

In June 2020, GP Global entered into a standard maritime transportation contract (the "Charter Party") with Milos to transport jet fuel aboard Milos's vessel, the SEAWAY MILOS. The Charter Party lists GP Global as the "Charterer" and Milos as the "Registered Owner" of the SEAWAY MILOS. The Charter Party does not refer to either Valero or Koch.

Under the Charter Party, GP Global agreed to pay Milos (through the "Clean Product Tankers Alliance") for transporting the fuel ("freight") and for any damages that might result from failing to unload the jet fuel by a certain time ("demurrage"). The Charter Party also specified that "[GP Global] shall have the option to instruct the vessel to increase speed with [GP Global] reimbursing [Milos] for the additional bunkers consumed, at replacement cost."

The Charter Party authorized the ship captain to sign bills of lading for the cargo. A bill of lading is a document "issued by the shipowner when goods are loaded on its ship, and may, depending on the circumstances, serve as a receipt, a document of title, a contract for the carriage of goods, or all of the above." *Asoma Corp. v. SK Shipping Co.*, 467 F.3d 817, 823 (2d Cir. 2006) (citation omitted). Ordinarily, a carrier like Milos is responsible for releasing cargo only to the party who presents an original bill of lading. *See C-ART, Ltd. v. Hong Kong Islands Line Am., S.A.*, 940 F.2d 530, 532 (9th Cir. 1991) (citation omitted). The Charter Party also contained a letter of indemnity provision, authorizing Milos

to release the jet fuel at delivery even if the bills of lading were unavailable:

> If original bills of lading are not available at discharging port in time, [Milos] agree[s] to release cargo in line with [GP Global]'s instructions against [a letter of indemnity] . . . without bank guarantee signed by [GP Global].

### The Fuel Purchase Agreement (Valero and Koch)

On July 14, Valero agreed to purchase the jet fuel from Koch on "cost and freight" ("CFR") terms. Under CFR terms, the seller arranges and pays for transportation to the port of delivery, while the buyer assumes title and risk of loss as soon as the cargo is loaded onto the carrier at the port of origin. *See, e.g.*, *BP Oil Int'l, Ltd. v. Empresa Estatal Petroleos de Ecuador*, 332 F.3d 333, 338 (5th Cir. 2003). Valero's agreement with Koch also required Valero to pay any demurrage costs directly to Koch. Neither Milos nor GP Global were a party to the fuel purchase agreement between Valero and Koch.

### The Bills of Lading

On July 19–20, the jet fuel was loaded onto the SEAWAY MILOS in Singapore in two batches. The captain of the SEAWAY MILOS issued original bills of lading for each batch. The bills list "Valero Marketing and Supply Company" as the party to notify when the shipment arrives. Each bill of lading also states "Freight Payable as Per Charter Party."

### The Voyage

On July 20, the SEAWAY MILOS left Singapore, expecting to arrive in Los Angeles on August 14. Because the negotiated delivery window had initially been August 3–7, Valero suggested to Koch that extra speed could be warranted. A week later GP Global instructed Milos to sail at maximum speed.

As the vessel neared Los Angeles, a Milos representative emailed Valero, Koch, and others, providing Milos's banking information and notifying them that freight should be paid upon discharge. On August 20–21, the jet fuel was unloaded from the SEAWAY MILOS and released to Valero without any payment to Milos. As the original bills of lading were unavailable at the discharge port, Milos released the jet fuel to Valero under a letter of indemnity from GP Global. On August 28, Valero paid Koch $15,791,634.77 in a lump sum for the jet fuel and freight charges. Koch eventually sent the original bills of lading to Valero about a month later.

### The Dispute

In September, the Milos representative advised Valero, Koch, and others that payment for freight was overdue. Valero denied responsibility because it was "not the charterer [GP Global]." When Milos insisted payment was due under the bills of lading, Valero lawyered up.

Less than a month later, Milos learned GP Global was in bad financial shape and had begun voluntary debt restructuring. Milos submitted a claim as part of that restructuring, then abandoned it.

In March 2022, Milos filed a complaint before the district court against Valero alleging claims for breach of contract and money had and received. The parties filed a

joint stipulation of facts and cross-motions for summary judgment. Milos did not oppose Valero's motion on the money-had-and-received claim, so the district court granted Valero's motion for summary judgment on Milos's sole equitable claim. But the district court also granted Milos's motion for summary judgment on the breach of contract claim. The district court found that Valero consented by its conduct to be bound by the bills of lading and, by incorporation, the Charter Party. The court noted that the Charter Party "does not expressly identify a party who must pay freight" and "appears to grant [Milos] authority to look to another party for payment of the freight charges." The court also concluded that Valero was alternatively liable under an implied promise to pay. Relying on *States Marine*, the court found that Valero's acceptance of the goods bestowed a benefit of carriage, which in turn subjected Valero to an implied obligation to pay the freight charges.

Valero timely appealed. To date, Milos has not been paid any of the $1,054,456.74 total cost to transport the jet fuel— $853,125.00 for freight, $186,282.72 for demurrage, and $15,049.02 for speed up charges.[1]

## II.

We have jurisdiction under 28 U.S.C. §§ 1291 & 1333(1). We review de novo a district court's summary judgment ruling. *Universal Health Servs. Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004). We also review de novo a district court's analysis of contractual language and

---

[1] For convenience, we will use "freight" in this case to include also demurrage and speed-up costs because they are allocated and analyzed identically here. In general, though, "freight" refers only to the base cost of transporting goods.

application of principles of contract interpretation. *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 367 (9th Cir. 1985).

## III.

Valero argues the district court erred in finding an express or implied contract because Valero was not a party to the Charter Party—which specifies that GP Global will pay freight—and because Valero did not directly or indirectly consent to be bound by the bills of lading. Valero also argues the district court erred by conflating the difference between private carriers and common carriers. In Valero's view, the district court relied on cases that were developed in a context unique to common carriers, involving, for example, publicly filed shipping rates. Applying these cases to private carriage, Valero says, threatens to upend long-held expectations in domestic and international shipping.

Milos responds that the district court correctly found an express or implied contract because Valero was subject to the Charter Party through its consent to be bound by the bills of lading. Milos further contends that Valero must pay in any event simply because it owned and received the goods and thereby benefitted from Milos's carriage. Milos asserts that any distinction between private and common carriage is irrelevant because common law principles animate both contexts. These principles, Milos says, make consignees jointly and severally liable for freight even when a contract specifies otherwise. In the alternative, Milos argues that this Court could find Valero liable under English law.

## A.

We begin with the law governing maritime freight liability. It is "well settled" that the party who sends the

goods—the "shipper" or "consignor"—is "primarily liable to the carrier for freight charges." *States Marine*, 524 F.2d at 247 (citing *Louisville & Nashville R.R. Co. v. Cent. Iron & Coal Co.*, 265 U.S. 59, 67 (1924)). That is true even when a bill of lading purports to impose liability on the receiver of the goods (the "consignee"). *Louisville & Nashville R.R. Co.*, 265 U.S. at 67. After all, "the shipper is presumably the consignor; the transportation ordered by him is presumably on his own behalf; and a promise by him to pay therefor is inferred." *Id.*

However, a contract or statute may form binding obligations that modify the general rule. *See States Marine*, 524 F.2d at 247–48. Of the two, a contract may be more significant because statutory default terms only come into play in the absence of a contract. *See Louisville & Nashville R.R. Co.*, 265 U.S. at 65–67. That is natural because parties are generally free to negotiate and assign freight liability however they like. *Id.* (the shipper's obligation to pay freight is not "absolute"—a "carrier and shipper [a]re free to contract" as to "when or by whom the payment should be made"). If a contract allocates freight liability to a party, that ends the court's inquiry. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 150–51 (2009) (citing 11 WILLISTON ON CONTRACTS § 30:4 (4th ed. 1999)); *see also C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 479 (9th Cir. 2000) (citing *Fikse & Co. v. United States*, 23 Cl. Ct. 200, 204 (1991)); *In re Roll Form Prods., Inc.*, 662 F.2d 150, 154 (2d Cir. 1981) (citing *Consol. Freightways Corp. v. Admiral Corp.*, 442 F.2d 56, 62 (7th Cir. 1971)).

If a contract allocates freight liability to a nonparty, then the court must determine whether the nonparty consented to be bound under the contract. *In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d 56, 71–72 (S.D.N.Y. 2009), *aff'd sub*

*nom. Chem One, Ltd. v. M/V Rickmers Genoa*, 502 Fed.
App'x 66 (2d Cir. 2012). For example, a bill of lading might
allocate freight liability to a consignee. But the consignee
would not be obligated to pay freight without evidence the
consignee consented to be bound under the bill of lading.
That evidence can be supplied by context. *See, e.g.*, *Ingram
Barge Co. v. Zen-Noh Grain Corp.*, 3 F.4th 275, 279 (6th
Cir. 2021). Typically, consignees demonstrate consent to be
bound by presenting the bill of lading and accepting the
goods under it. *See id.* at 282 (White, J., dissenting) (citing
*Neilsen v. Jesup*, 30 F. 138, 139 (S.D.N.Y. 1887); *Pacific
Coast Fruit Distribs. v. Pa. R.R. Co.*, 217 F.2d 273, 275 (9th
Cir. 1954)). Similarly, consignees may show their consent to
be bound under a bill of lading by suing on the bill of lading,
or by silence in context of longstanding dealings, or by the
consignee's agent negotiating the bill of lading. *See Ingram
Barge*, 3 F.4th at 279. Notice that all these contexts show the
consignee is aware of the terms to which they are agreeing.

If no contract allocates freight liability, courts may still
find an implied promise to pay in some circumstances. For
example, common carriers must charge publicly posted rates
and are subject to default terms of a uniform bill of lading.
*See* Interstate Commerce Act ("ICA"), 49 U.S.C. §§ 101 *et
seq.*; *see also* 49 C.F.R. § 1035.1. In that context, "where the
parties fail to agree or where discriminatory practices are
present[,] . . . the ICA's default terms bind the parties."
*C.A.R. Transp. Brokerage Co.*, 213 F.3d at 479 (citing *In re
Roll Form Prods., Inc.*, 662 F.2d at 154).

Default terms formed the basis for liability in *Pacific
Coast.* 217 F.2d at 274–75. The appellee railroad and all
other common carriers at the time used a Uniform Bill of
Lading. *Id.* at 274. The Uniform Bill of Lading was
prescribed by the ICA and approved by the Interstate

Commerce Commission and had the force of law. *Ill. Steel Co. v. Balt. & Ohio R.R. Co.*, 320 U.S. 508, 508–09 (1944). Section 7 of the Uniform Bill of Lading provided that the owner or consignor or consignee are alternately liable for freight. *Id.* at 512; *Pacific Coast*, 217 F.2d at 274. Thus, in *Pacific Coast*, "there [was] only to be considered whether appellant was, in fact, owner, consignor or consignee." *Id.* at 275. Similarly, *Illinois Steel* "raise[d] only a single question[,]" which was whether the parties' stipulation was sufficient to relieve the consignor of liability after an initial prepayment of freight. *See* 320 U.S. at 513–15. Because the Section 7 default terms permitted precisely that stipulation, the *Illinois Steel* Court determined that any tension in the contract terms did not "revive the obligation which, in the absence of that clause, rests on the consignor to pay all lawful charges on his shipments." *Id.* at 513.

Discriminatory practices prohibited by statute may also form a basis for an implied obligation. In *Pittsburg, Cincinnati, Chicago & St. Louis Railway Co. v. Fink*, 250 U.S. 577 (1919), the Supreme Court held a consignee liable for the full freight cost even though the carrier initially demanded and the consignee paid only half that cost. *Id.* at 581–83. The Court reasoned that it would be unlawful to charge the consignee any less because the ICA's animating purpose was to prevent price discrimination higher or lower than the tariff rate. *Id.* at 581. Before turning its examination to liability under the ICA, *Fink* noted a conflict in the common law's allocation of liability "under the circumstances." *Id.* at 580–81. The Court remarked that "the weight of authority seems to be that the consignee is prima facie liable for the payment of the freight charges when he accepts the goods from the carrier." *Id.* at 581 (citing

HUTCHINSON ON CARRIERS (3d Ed.) § 807[2]). We will return to this remark in a moment.

Where statute or default rules imply a consignee's promise to pay freight upon acceptance, courts may also have to consider whether a party *acted* as the consignee, *see, e.g.*, *Pacific Coast*, 217 F.2d at 275, or whether the consignee *accepted* the goods, *see, e.g.*, *States Marine*, 524 F.2d at 248. *States Marine* analyzed whether a named consignee impliedly accepted goods by exercising dominion and control over them. *Id.* at 248–49. In so doing, *States Marine* relied on common law developed in railroad cases and extended it to ocean carriers:

> Virtually all of the cases on a consignee's liability for freight charges involve railroads operating under the [Interstate] Commerce Act and tariffs filed thereunder. Since the rules established in those cases depend on both the common law and statutory authority derived from common law, the rules established in the railroad cases may properly be applied to ocean shippers *operating under tariffs* filed pursuant to the Shipping Act.

524 F.2d at 248 n.3 (emphasis added).

*States Marine* is susceptible to different readings. It could extend railroad cases *only* to ocean carriers operating under tariffs and subject to default terms, or it could extend

---

[2] *Fink* actually cites to § 1559, but that section does not exist. However, *page* 1559 refers in turn to sections 807 and 809, which discuss consignee liability. Of the two, section 807 is more clearly the section *Fink* relied on.

railroad cases to all ocean carriers *including* those operating under tariffs and subject to default terms. The difference is not insignificant and appears to have caused some confusion among the lower courts—including the district court here—and in our sister circuits. *See, e.g.*, *A/S Dampskibsselskabet Torm v. Beaumont Oil Ltd.*, 927 F.2d 713, 717 (2d Cir. 1991) (applying *States Marine*'s "presumptive owner" analysis to a private contract); *Ivaran Lines v. Sutex Paper & Cellulose Corp.*, No. 84-921-CIV-HOEVELER, 1986 WL 15754, at *2–3 (S.D. Fla. Feb. 12, 1986) (same); *Waterman S.S. Corp. v. 350 Bundles of Hardboard*, 603 F. Supp. 490, 492 (D. Mass. 1984) (same). Accordingly, we must clarify *States Marine*. We do so by adopting a narrow reading of it—*States Marine* applied rules established in railroad cases to ocean carriers only to the extent that both are common carriers.

A narrow reading of *States Marine* is in harmony with basic principles of contract formation. "The law of private carriage, now primarily charter parties, . . . is still governed by the principle of freedom of contract." *Common Carriage and Private Carriage*, 1 ADMIRALTY & MAR. LAW § 10:3 (6th ed.). Parties to a freight contract, like any other contract, are free to assign liability as they wish, provided their allocation does not run afoul of the law. *See Oak Harbor Freight Lines, Inc. v. Sears Roebuck, & Co.*, 513 F.3d 949, 956 (9th Cir. 2008) (citing *Louisville & Nashville R.R. Co.*, 265 U.S. at 66–67); *C.A.R. Transp. Brokerage Co*, 213 F.3d at 479. Beyond that, an offer generally must precede acceptance. *See* 1 WILLISTON ON CONTRACTS § 4:16; RESTATEMENT (SECOND) OF CONTRACTS § 23 (AM. L. INST. 1981); *see also Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 121 (2d Cir. 2012). For common carriage contracts, the published rate forms an "offer," which is "accepted" by receipt of the goods under a bill of lading, charter party, or

default rules obligating a consignee. Without a published rate, it would be quite possible for a private consignee's "acceptance" to precede the "offer" of the private carrier's rates. And the consignee's "acceptance" could only demonstrate a meeting of the minds if consignee liability was one of the terms of the transaction.

Our reading of *States Marine* also fits with the common law underpinning the railroad cases. As *Fink* observed, "under the circumstances . . . . [t]he weight of authority seems to be that the consignee is prima facie liable for the payment of the freight charges when he accepts the goods from the carrier." *Id.* at 581 (citing HUTCHINSON ON CARRIERS (3d Ed.) § 807). That observation is prone to misstatement. In context, "under the circumstances" means where a consignee has accepted liability for some of the freight cost but refuses to pay all of it. The cases underlying *Fink*'s remark make that clear—they were decided under similar circumstances, where the consignee was expressly liable under the charter party or bill of lading, or had already paid part of the transport costs.[3] That is the context for *States*

---

[3] *See* HUTCHINSON ON CARRIERS (3d Ed.) § 807 (citing *Taylor v. Ironworks*, 124 Fed. 826 (S.D.N.Y. 1903) (consignee liable for freight where charter party said it was); *North-German Lloyd v. Heule*, 44 F. 100 (S.D.N.Y. 1890) (same); *Gates v. Ryan*, 37 F. 154 (S.D.N.Y. 1888) (consignee liable where it agreed to pay freight); *Neilsen v. Jesup*, 30 F. 138 (S.D.N.Y. 1887) (consignee liable for demurrage where bill of lading made it liable for freight); *Irzo v. Perkins*, 10 F. 138 (S.D.N.Y. 1881) (consignee liable for demurrage where it orally agreed to pay); *Davison v. City Bank of Oswego*, 57 N.Y. 81 (1874) (consignee liable where bill of lading said it was); *Phila., etc., R. R. v. Barnard*, 3 Ben. 39 (D.C.N.Y. 1868) (consignee liable for freight where it understood that it would be liable); *Wegener v. Smith*, 15 Com. B. 285 (1854) (consignee liable for demurrage where charter party said it was); *Kemp v. Clark*, 12 Q. B. 647 (1848) (consignee liable where it promised to

*Marine*'s use of "the rules established in . . . *both* the common law and statutory authority derived from the common law." 524 F.2d at 248 n.3 (emphasis added). These rules are consistent with each other because they comport with the fundamental notion that a contract requires notice of its terms.

Finally, a narrow reading of *States Marine* is common sense. Consider if a shipper contracted with a private carrier for freight way over the usual rate for a given route, then listed the consignee as the party liable to pay freight. Without some guarantee the consignee understood the terms in advance—like, say, a published tariff—implying an obligation to pay freight based only on acceptance might sanction underhanded dealing. We decline to expose consignees to such unknown liabilities.

Any implied obligation for private-carrier consignees to pay freight must fit with foundational contract principles. Unlike common-carrier consignees, private-carrier consignees are not presumed to know key terms simply because they receive and accept goods. And they are certainly not expected to know they are liable for freight when an express contract says they are not. Therefore, private-carrier consignees cannot be under the same presumptive obligation to pay freight upon acceptance. A narrow reading of *States Marine* makes that clear.

---

pay freight, then tried to back out); *Sanders v. Vanzeller*, 4 Q. B. 260 (1843) (consignee liable for freight where charter party said it was) ("The principle, therefore, is that the taking, under these circumstances, is a virtual assent to the terms of the bill [of lading]."); *Cock v. Taylor*, 13 East 399 (1811) (consignee liable for freight where bill of lading said it was); *Jesson v. Solly*, 4 Taunt. 52 (1811) (consignee liable for demurrage where bill of lading said it was)).

**B.**

Applying these principles, we look first to whether an express contract exists between Milos and Valero that might rebut the presumption that the shipper, GP Global, pays freight. *See Dynamic Worldwide Logistics, Inc. v. Exclusive Expressions, LLC*, 77 F. Supp. 3d 364, 375 (S.D.N.Y. 2015). We find none. To the contrary: the Charter Party between Milos and GP Global specifically states that GP Global will pay freight. It says "[f]reight shall be earned concurrently with delivery of cargo . . . and shall be paid by Charterers [GP Global] to Owners [Milos]," "[GP Global] shall pay . . . demurrage without delay," and "[GP Global] shall pay [Milos] for additional bunkers [of oil] consumed" from revised orders like speed-up instructions.[4] Not only that, but Valero's contract with Koch includes freight in the purchase price. Perhaps Valero's payment of freight to Koch was expected to pass through GP Global to Milos. We need not wonder. The Charter Party provides that GP Global and GP Global alone will pay freight. That is the end of it.

---

[4] The district court appears to have overlooked these contract terms. It also misapprehended another aspect of the Charter Party, which says payment must be made "upon completion of discharge as per owner[']s telexed/e-mailed invoice." That statement did not permit Milos to bind a nonparty merely by sending them an invoice. How could it? "An agreement is a manifestation of *mutual* assent on the part of two or more persons." Restatement (Second) of Contracts § 3 (1981) (emphasis added); *see also U.S. v. Waterman S.S. Corp.*, 471 F.2d 186, 189 n.4 (5th Cir. 1973) ("A party cannot unilaterally employ definitions to bind another by provisions to which the other has not consented to be bound."). Rather, this provision in the Charter Party simply dictates when GP Global's payment obligation becomes due.

**i.**

Milos nonetheless contends that Valero's conduct shows it consented to be bound by the bills of lading. In Milos's view, Valero's acceptance of the fuel, on its own or together with certain acts of "dominion and control," is sufficient to imply its agreement to pay freight under *Pacific Coast*. We are not persuaded that Valero exercised any control over the good ship SEAWAY MILOS or its freight. True, Valero suggested Koch might ask GP Global to tell Milos to speed up, but there is no reply or confirmation in the record. That hardly amounts to "dominion and control." And besides, the bills of lading say, "freight payable as per Charter Party." And the Charter Party makes freight payable by GP Global alone. So it doesn't really matter if Valero was bound by the bills of lading or not.

But Milos is wrong in even more fundamental ways. First, *Pacific Coast* does not mean that acceptance is enough to show consent to be bound. *Pacific Coast* involved a common carrier with a different bill of lading that expressly allocated freight liability to the consignee. 217 F.2d at 274. The main question was whether appellant *acted* as a consignee by accepting and directing goods. *Id*. at 274–75. That was why the *Pacific Coast* court looked at appellant's conduct. By contrast, here the parties agree Valero was the consignee. Any analysis of Valero's conduct focuses on whether Valero agreed to be bound, not whether it acted as consignee by accepting the goods. Those inquiries are distinct, and do not combine to form a general "consent-to-be-bound" conduct framework.

Second—and applying the correct framework—Valero's conduct does not show that it agreed to be bound by the bills of lading. Valero did not sue on the bills of lading, Valero

has no longstanding dealings with Milos, and Milos does not argue Valero negotiated the bills of lading through GP Global. *See Ingram Barge*, 3 F.4th at 279–80.

As for presenting the bills of lading and accepting goods under them, the parties agree that the bills of lading were not available when Valero received the fuel. Instead, under the terms of the Charter Party, Milos released the fuel under a letter of indemnity from GP Global (the "LOI"). The LOI served only to indemnify Milos from "liability, loss, damage or expense" for releasing the cargo without presentation of the original bills of lading. The LOI did not modify the Charter Party, including its payment terms. Milos also characterizes presenting bills of lading before accepting goods as a "formality." That is an odd way of putting it. Presenting a bill of lading before accepting goods is customary because that ensures notice of the bill's terms. If a party does not agree to the terms, they can choose not to exchange the bill for goods. Requiring presentation to precede acceptance is thus a formality for good reason.

### ii.

Milos also contends that an obligation to pay may be implied to Valero. Milos finds this obligation primarily under *Beaumont Oil* and *States Marine*. *Beaumont Oil* is not binding on this court, is distinguishable, and its use of *States Marine*'s presumptive ownership analysis as a freestanding inquiry appears not to have gained much traction. *See, e.g.*, *APL Co. Pte. v. Kemira Water Sols., Inc.*, 890 F. Supp. 2d 360, 367 (S.D.N.Y. 2012) ("[C]ritically, in *Beaumont Oil*, the bill of lading at issue was silent as to which party was obligated to pay freight charges."). And as discussed above, Milos's argument is based on a misunderstanding of *States Marine*. That case extended railroad case law only to ocean

carriers operating under tariffs. The many common-carrier cases cited by Milos are therefore inapplicable. *See, e.g.*, *Fink*, 250 U.S. at 581 (liability implied by statute); *Dare v. N.Y. Cent. R.R. Co.*, 20 F.2d 379, 380 (2nd Cir. 1927) (liability implied by bill of lading specifying consignee liability); *Arizona Feeds v. S. Pac. Transp. Co.*, 21 Ariz. App. 346, 353 (1974) (same). That is particularly true where, as here, an express agreement allocates freight liability exclusively to the charterer, GP Global.

Notwithstanding its express and exclusive contract with GP Global, Milos argues Valero should be jointly and severally liable for freight alongside GP Global. The two cases Milos cites for that proposition do not hold water. One involved default rules under a universal bill of lading, *Ill. Steel Co.*, 320 U.S. 508, and the other involved bills of lading that explicitly obligated the consignee together with the shipper to pay freight, *Exel Transp. Servs., Inc. v. CSX Lines LLC*, 280 F. Supp. 2d 617 (S.D. Tex. 2003). Not only is there no general rule imputing joint and several liability to consignees for freight costs, but such a rule would invade the right to freedom of contract. *C.f. Louisville & Nashville R.R. Co.*, 265 U.S. at 66–67 (1924) (cataloguing various ways parties are free to allocate freight liability).

Milos insists that letting Valero off the hook would be inequitable. This argument apparently persuaded the district court, which effectively fashioned an equitable remedy by combining the common-carrier consignee's implied obligation to pay freight with the finding that Valero "benefitted" from the carriage of its jet fuel. But Milos abandoned its equitable claim (money had and received) below and proceeded only on a breach of contract claim. In any event, Milos is not entitled to equitable relief. True, Valero benefitted from Milos's carriage. But it did not

benefit unjustly. *See In re De Laurentiis Ent. Grp., Inc.*, 963 F.2d 1269, 1272 (9th Cir. 1992) ("Quantum meruit (or quasi-contract) is an equitable remedy implied by the law under which a plaintiff who has rendered services benefiting the defendant may recover the reasonable value of those services *when necessary to prevent unjust enrichment of the defendant*.") (emphasis added). Valero paid cost and freight charges to Koch when it purchased the jet fuel under CFR terms. Because Valero was not unjustly enriched, Milos cannot recover from Valero under a quasi-contract.

### iii.

In the alternative, Milos argues we should find that Valero is obligated to pay freight under the Charter Party's English choice-of-law provision. The district court did not reach this issue, and we decline to decide it in the first instance. *See Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998) ("Generally, we do not consider an issue not passed upon below." (internal quotation marks omitted)).

### IV.

In sum, we conclude Valero has no express or implied obligation to pay freight, demurrage, or speed-up costs to Milos, and Milos cannot recover in equity. Accordingly, we **REVERSE** the district court's order granting summary judgment for Milos and **REMAND** for further proceedings consistent with this opinion.